(Slip Opinion)       OCTOBER TERM, 2005                1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## EMPIRE HEALTHCHOICE ASSURANCE, INC. DBA EMPIRE BLUE CROSS BLUE SHIELD *v.* MCVEIGH AS ADMINISTRATRIX OF THE ESTATE OF MCVEIGH

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 05–200.  Argued April 25, 2006—Decided June 15, 2006

Under the Federal Employees Health Benefits Act of 1959 (FEHBA), the Office of Personnel Management (OPM) negotiates and regulates health-benefits plans for federal employees.  See 5 U. S. C. §8902(a).  FEHBA provides for Government payment of about 75% of health-plan premiums, and for enrollee payment of the rest.  §8906(b).  Premiums thus shared are deposited in a special Treasury Fund, from which carriers draw to pay for covered benefits, §8909(a).  FEHBA has a preemption provision which provides: "The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law . . . which relates to health insurance or plans." §8902(m)(1).  The Act contains no provision addressing carriers' subrogation or reimbursement rights.  FEHBA's sole jurisdictional provision vests federal district courts with "original jurisdiction . . . of a civil action or claim against the United States." §8912.  While an OPM regulation channels disputes over coverage or benefits into federal court by designating OPM the sole defendant, see 5 CFR §890.107(c), no law opens federal courts to carriers seeking reimbursement.

OPM has contracted with the Blue Cross Blue Shield Association (BCBSA) to provide a nationwide fee-for-service health plan administered by local companies (Plan).  The Plan obligates the carrier to make "a reasonable effort" to recoup amounts paid for medical care, and the statement of benefits the carrier distributes alerts enrollees that recoveries they receive must be used to reimburse the Plan for benefits paid.  Petitioner Empire HealthChoice Assurance, Inc. (Em-

pire), administers the BCBSA Plan as it applies to federal employees in New York State. Respondent Denise McVeigh (McVeigh) is the administrator of the estate of Joseph McVeigh (Decedent), a former Plan enrollee who was injured in an accident. This case originated when a state-court tort suit brought by McVeigh against third parties alleged to have caused the Decedent's injuries terminated in a settlement. Empire filed this suit in federal court invoking 28 U. S. C. §1331, which authorizes jurisdiction over "civil actions arising under the . . . laws . . . of the United States." Empire sought reimbursement of the $157,309 it had paid under the Plan for the Decedent's medical care, with no offset for McVeigh's attorney's fees or other litigation costs in the state-court tort action. The District Court granted McVeigh's motion to dismiss for want of subject-matter jurisdiction.

The Second Circuit affirmed, holding that Empire's claim arose under state law. Observing that FEHBA's text does not authorize carriers to vindicate in federal court their rights against enrollees under FEHBA-authorized contracts, the court concluded that federal jurisdiction could exist only if federal common law governed Empire's claim. Quoting *Boyle* v. *United Technologies Corp.,* 487 U. S. 500, 507, 508, the appeals court stated that courts may create federal common law only when state law would (1) "'significant[ly] conflict'" with (2) "'uniquely federal interest[s].'" Empire maintained that its contract-derived reimbursement claim implicated "uniquely federal interest[s]" because (1) reimbursement directly affects the United States Treasury and the cost of providing health benefits to federal employees, and (2) Congress has expressed its interest in maintaining uniformity among the States on matters relating to federal health-plan benefits. The court acknowledged that the case involved such interests, but found that Empire had not identified specific ways in which the operation of state law would conflict materially with the policies underlying FEHBA in the circumstances presented. Also rejecting Empire's argument that FEHBA's preemption provision independently conferred federal jurisdiction, the court emphasized that §8902(m)(1) makes no reference to a federal right of action in, or federal jurisdiction over, a contract-derived reimbursement claim.

*Held:* Section 1331 does not encompass Empire's suit. Pp. 9–21.

(a) A case "aris[es] under federal law" for §1331 purposes if "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of Cal.* v. *Construction Laborers Vacation Trust for Southern Cal.,* 463 U. S. 1, 27–28. Pp. 9–10.

(b) *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, does not provide a basis for federal jurisdiction here. In *Clearfield,* a Govern-

ment suit against a bank to recover the amount paid on a Government check on which the payee's name had been forged, *id.*, at 365, the Court held that "[t]he rights and duties of the United States on commercial paper which it issues are governed by federal rather than [state] law," *id.*, at 366. In post-*Clearfield* decisions, however, the Court made clear that uniform federal law need not always be applied in Government litigation. For example, in *United States* v. *Kimbell Foods, Inc.,* 440 U. S. 715, 740, the Court declared that "the prudent course" is often "to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation." The reimbursement and subrogation provisions in the OPM-BCBSA contract are linked together and depend upon a recovery from a third party under terms and conditions ordinarily governed by state law. Focusing on reimbursement, the appeals court determined that Empire has not demonstrated a significant conflict between an identifiable federal interest and the operation of state law. Unless and until that showing is made, there is no cause to displace state law, much less to lodge this case in federal court. Pp. 10–12.

(c) Empire and *amicus* United States argue that, under *Jackson Transit Authority* v. *Transit Union,* 457 U. S. 15, 22, Empire's reimbursement claim, arising under the OPM-BCBSA contract, states a federal claim because Congress intended all rights and duties stemming from that contract to be federal in nature.

The reliance placed on *Jackson Transit* is surprising, for the Court there determined that the claim at issue—a union's suit against a city agency to enforce agreements the parties had made in light of §13(c) of the Urban Mass Transportation Act of 1964 (UMTA), which conditioned the city's receipt of federal funds on preservation of employees' collective-bargaining rights—did not arise under federal law, but was instead "governed by state law [to be] applied in state cour[t]." *Id.*, at 29. The Court there acknowledged prior decisions "determin[ing] that a plaintiff stated a federal claim when he sued to vindicate contractual rights *set forth by federal statutes* [that] lacked express provisions creating federal causes of action." *Id.*, at 22 (emphasis added). However, the Court held that these cases did not control because "the critical factor" in each of them was "the congressional intent behind the particular provision at issue." *Ibid.* Although there were some indications that the UMTA made "§13(c) agreements and collective-bargaining contracts creatures of federal law," *id.*, at 23, countervailing considerations—primarily a long-standing National Labor Relations Act exemption for labor relations between local governments and their employees—demonstrated a congressional intent to the contrary, *id.*, at 23–24.

Measured against *Jackson Transit*'s discussion of when a claim

Syllabus

arises under federal law, Empire's contract-derived reimbursement claim is not a "creatur[e] of federal law." *Id.*, at 23. While distinctly federal elements are involved here, countervailing considerations control, particularly FEHBA's jurisdictional provision, §8912, which opens the federal district-court door to civil actions "against the United States." OPM's regulation, 5 CFR §809.107(c), instructs enrollees seeking to challenge benefit denials to proceed in federal court against OPM "and not against the carrier or carrier's subcontractors." Read together, these prescriptions ensure that beneficiaries' suits will land in federal court. Had Congress found it necessary or proper to extend federal jurisdiction to contract-derived reimbursement claims between carriers and insured workers, it would have been easy enough to say so. Cf. 29 U. S. C. §1132(a)(3). *Jackson Transit* noted that while "private parties in appropriate cases may sue in federal court to enforce contractual rights created by federal statutes," 457 U. S., at 22, *Jackson Transit* involved no such right.

Nor can §8902(m)(1), FEHBA's preemption prescription, be read as a jurisdiction-conferring provision. That prescription is unusual in that it renders preemptive contract terms in health insurance plans, not provisions enacted by Congress. A prescription of that unusual order warrants cautious interpretation. Section 8902(m)(1) is a puzzling measure, open to more than one construction, and no prior decision seems to us precisely on point. If §8902(m)(1) does not cover contract-based reimbursement claims, then federal jurisdiction clearly does not exist. But even if §8902(m)(1) reaches such claims, the prescription is not sufficiently broad to confer federal jurisdiction. If Congress intends a preemption instruction completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear. Cf., *e.g., Columbus* v. *Ours Garage & Wrecker Service, Inc.,* 536 U. S. 424, 432–433. Congress has not done so here. Section 8902(m)(1) does not purport to render inoperative *any and all* state laws that in some way bear on federal employee-benefit plans. Cf. 29 U. S. C. §1144(a). And, given that §8902(m)(1) declares no federal law preemptive, but instead, terms of an OPM-BCBSA negotiated contract, a modest reading of the provision is in order. Furthermore, a reimbursement right of the kind Empire here asserts stems from a personal-injury recovery, and the claim underlying that recovery is plainly governed by state law. This Court is not prepared to say, based on the presentations made in this case, that under §8902(m)(1), an OPM-BCBSA contract term would displace every condition state law places on that recovery. The BCBSA Plan's statement of benefits links together the carrier's right to reimbursement from the insured and its right to subrogation. Empire's subrogation right allows it, once it has paid an

insured's medical expenses, to recover directly from a third party responsible for the insured's injury or illness. Had Empire taken that course, no access to a federal forum could have been predicated on the OPM-BCBSA contract right. The tortfeasors' liability, whether to the insured or the insurer, would be governed not by an agreement to which the tortfeasors are strangers, but by state law, and §8902(m)(1) would have no sway. Pp. 12–18.

(d) Also rejected is the United States' alternative argument that Empire's reimbursement claim arises under federal law for §1331 purposes because federal law is a necessary element of the carrier's claim for relief. In making this argument, the Government relies on *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Mfg.,* 545 U. S. 308, which involved real property owned by Grable that the Internal Revenue Service (IRS) seized to satisfy a federal tax deficiency, *id.,* at 310. Grable received notice of the seizure by certified mail before the IRS sold the property to Darue. Grable later sued Darue in state court to quiet title, asserting that Darue's record title was invalid because the IRS had conveyed the seizure notice improperly under 26 U. S. C. §6335(a), which requires that "notice in writing . . . be given . . . to the owner . . . or . . . left at his usual place of abode or business." Darue removed the case to federal court. Alleging that Grable's title depended on the interpretation of a federal statute, §6335(a), Darue invoked federal-question jurisdiction under 28 U. S. C. §1331. This Court held that the removal was proper because §6335(a)'s meaning was an important federal-law issue that sensibly belonged in a federal court, and the question whether Grable received adequate notice was "the only . . . issue contested in the case." 545 U. S., at 315. This case is poles apart from *Grable*. Here, the reimbursement claim was triggered, not by a federal agency's action, but by the settlement of a personal-injury action launched in state court, and the bottom-line practical issue is the share of that settlement properly payable to Empire. *Grable* presented a nearly pure issue of law, the resolution of which would establish a rule applicable to numerous tax sale cases. Empire's reimbursement claim, in contrast, is fact bound and situation specific. Although the United States is correct that a reimbursement claim may also involve as an issue the extent to which the reimbursement should take account of attorney's fees expended to obtain the tort recovery, it is hardly apparent why a proper federal-state balance would place such a nonstatutory issue under the complete governance of federal law, to be declared in a federal forum. The state court in which the personal-injury suit was lodged is competent to apply federal law, to the extent it is relevant, and would seem best positioned to determine the lawyer's part in obtaining, and fair share in, the tort recovery. The Government's im-

Syllabus

portant interests in attracting able workers and assuring their health and welfare do not warrant turning into a discrete and costly "federal case" an insurer's contract-derived claim to be reimbursed from a federal worker's state-court-initiated tort litigation. This case cannot be squeezed into the slim category *Grable* exemplifies. Pp. 18–21.

396 F. 3d 136, affirmed.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SCALIA, and THOMAS, JJ., joined. BREYER, J., filed a dissenting opinion, in which KENNEDY, SOUTER, and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–200

EMPIRE HEALTHCHOICE ASSURANCE, INC., DBA EMPIRE BLUE CROSS BLUE SHIELD, PETITIONER *v.* DENISE F. MCVEIGH, AS ADMINISTRATRIX OF THE ESTATE OF JOSEPH E. MCVEIGH

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 15, 2006]

JUSTICE GINSBURG delivered the opinion of the Court.

The Federal Employees Health Benefits Act of 1959 (FEHBA), 5 U. S. C. §8901 *et seq.* (2000 ed. and Supp. III), establishes a comprehensive program of health insurance for federal employees. The Act authorizes the Office of Personnel Management (OPM) to contract with private carriers to offer federal employees an array of health-care plans. See §8902(a) (2000 ed.). Largest of the plans for which OPM has contracted, annually since 1960, is the Blue Cross Blue Shield Service Benefit Plan (Plan), administered by local Blue Cross Blue Shield companies. This case concerns the proper forum for reimbursement claims when a plan beneficiary, injured in an accident, whose medical bills have been paid by the plan administrator, recovers damages (unaided by the carrier-administrator) in a state-court tort action against a third party alleged to have caused the accident.

FEHBA contains a preemption clause, §8902(m)(1), displacing state law on issues relating to "coverage or

benefits" afforded by health-care plans.  The Act contains no provision addressing the subrogation or reimbursement rights of carriers.  Successive annual contracts between OPM and the Blue Cross Blue Shield Association (BCBSA) have obligated the carrier to make "a reasonable effort" to recoup amounts paid for medical care.  App. 95, 125.  The statement of benefits distributed by the carrier alerts enrollees that all recoveries they receive "must be used to reimburse the Plan for benefits paid."  *Id.*, at 132; see also *id.*, at 146, 152.

The instant case originated when the administrator of a Plan beneficiary's estate pursued tort litigation in state court against parties alleged to have caused the beneficiary's injuries.  The carrier had notice of the state-court action, but took no part in it.  When the tort action terminated in a settlement, the carrier filed suit in federal court seeking reimbursement of the full amount it had paid for the beneficiary's medical care.  The question presented is whether 28 U. S. C. §1331 (authorizing jurisdiction over "civil actions arising under the . . . laws . . . of the United States") encompasses the carrier's action.  We hold it does not.

FEHBA itself provides for federal-court jurisdiction only in actions against the United States.  Congress could decide and provide that reimbursement claims of the kind here involved warrant the exercise of federal-court jurisdiction.  But claims of this genre, seeking recovery from the proceeds of state-court litigation, are the sort ordinarily resolved in state courts.  Federal courts should await a clear signal from Congress before treating such auxiliary claims as "arising under" the laws of the United States.

I

FEHBA assigns to OPM responsibility for negotiating and regulating health benefits plans for federal employees.  See 5 U. S. C. §8902(a).  OPM contracts with carriers,

FEHBA instructs, "shall contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable." §8902(d). Pursuant to FEHBA, OPM entered into a contract in 1960 with the BCBSA to establish a nationwide fee-for-service health plan, the terms of which are renegotiated annually. As FEHBA prescribes, the Federal Government pays about 75% of the premiums; the enrollee pays the rest. §8906(b) (2000 ed.). Premiums thus shared are deposited in a special Treasury Fund, the Federal Employees Health Benefits Fund, §8909(a). Carriers draw against the Fund to pay for covered health-care benefits. *Ibid.;* see also 48 CFR §1632.170(b) (2005).

The contract between OPM and the BCBSA provides: "By enrolling or accepting services under this contract, [enrollees and their eligible dependents] are obligated to all terms, conditions, and provisions of this contract." App. 90. An appended brochure sets out the benefits the carrier shall provide, see *id.*, at 89, and the carrier's subrogation and recovery rights, see *id.*, at 100. Each enrollee, as FEHBA directs, receives a statement of benefits conveying information about the Plan's coverage and conditions. 5 U. S. C. §8907(b). Concerning reimbursement and subrogation, matters FEHBA itself does not address, the BCBSA Plan's statement of benefits reads in part:

> "If another person or entity . . . causes you to suffer an injury or illness, and if we pay benefits for that injury or illness, you must agree to the following:
>
> "All recoveries you obtain (whether by lawsuit, settlement, or otherwise), no matter how described or designated, must be used to reimburse us in full for benefits we paid. Our share of any recovery extends only to the amount of benefits we have paid or will pay to you or, if applicable, to your heirs, administrators, successors, or assignees."

. . . . .

"If you do not seek damages for your illness or in-jury, you must permit us to initiate recovery on your behalf (including the right to bring suit in your name). This is called subrogation.

"If we pursue a recovery of the benefits we have paid, you must cooperate in doing what is reasonably necessary to assist us. You must not take any action that may prejudice our rights to recover." App. 165.[1]

If the participant does not voluntarily reimburse the Plan, the contract requires the carrier to make a "reasonable effort to seek recovery of amounts . . . it is entitled to re-cover in cases . . . brought to its attention." *Id.*, at 95, 125. Pursuant to the OPM-BCBSA master contract, reim-bursements obtained by the carrier must be returned to the Treasury Fund. See *id.*, at 92, 118–119.

FEHBA contains a preemption provision, which origi-nally provided:

"The provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans to the extent that such law

––––––––––

[1] The statement of benefits further provides:

"You must tell us promptly if you have a claim against another party for a condition that we have paid or may pay benefits for, and you must tell us about any recoveries you obtain, whether in or out of court. We may seek a lien on the proceeds of your claim in order to reimburse ourselves to the full amount of benefits we have paid or will pay.

"We may request that you assign to us (1) your right to bring an action or (2) your right to the proceeds of a claim for your illness or injury. We may delay processing of your claims until you provide the assignment.

"*Note:* We will pay the costs of any covered services you receive that are in excess of any recoveries made." App. 165.

or regulation is inconsistent with such contractual provisions." 5 U. S. C. §8902(m)(1) (1994 ed.).

To assure uniform coverage and benefits under plans OPM negotiates for federal employees, see H. R. Rep. No. 95–282, p. 1 (1977), §8902(m)(1) preempted "State laws or regulations which specify types of medical care, providers of care, extent of benefits, coverage of family members, age limits for family members, or other matters relating to health benefits or coverage," *id.*, at 4–5 (noting that some States mandated coverage for services not included in federal plans, for example, chiropractic services). In 1998, Congress amended §8902(m)(1) by deleting the words "to the extent that such law or regulation is inconsistent with such contractual provisions." Thus, under §8902(m)(1) as it now reads, state law—whether consistent or inconsistent with federal plan provisions—is displaced on matters of "coverage or benefits."

FEHBA contains but one provision addressed to federal-court jurisdiction. That provision vests in federal district courts "original jurisdiction, concurrent with the United States Court of Federal Claims, of a civil action or claim against the United States founded on this chapter." §8912. The purpose of this provision—evident from its reference to the Court of Federal Claims—was to carve out an exception to the statutory rule that claims brought against the United States and exceeding $10,000 must originate in the Court of Federal Claims. See 28 U. S. C. §1346(a)(2) (establishing district courts' jurisdiction, concurrent with the Court of Federal Claims, over claims against the United States that do not exceed $10,000); see also S. Rep. No. 1654, 83d Cong., 2d Sess., pp. 4–5 (1954) (commenting, with respect to an identical provision in the Federal Employees Group Life Insurance Act, 5 U. S. C. §8715, that the provision "would extend the jurisdiction of United States district courts above the $10,000 limitation now in

effect").

Under a 1995 OPM regulation, suits contesting final OPM action denying health benefits "must be brought against OPM and not against the carrier or carrier's sub-contractors."  5 CFR §890.107(c) (2005).  While this regulation channels disputes over coverage or benefits into federal court by designating a United States agency (OPM) sole defendant, no law opens federal courts to carriers seeking reimbursement from beneficiaries or recovery from tortfeasors.  Cf. 29 U. S. C. §1132(e)(1) (provision of the Employee Retirement Income Security Act (ERISA) vesting in federal district courts "exclusive jurisdiction of civil actions under this subchapter").  And nothing in FEHBA's text prescribes a federal rule of decision for a carrier's claim against its insured or an alleged tortfeasor to share in the proceeds of a state-court tort action.

## II

Petitioner Empire Healthchoice Assurance, Inc., doing business as Empire Blue Cross Blue Shield (Empire), is the entity that administers the BCBSA Plan as it applies to federal employees in New York State.  Respondent Denise Finn McVeigh (McVeigh) is the administrator of the estate of Joseph E. McVeigh (Decedent), a former enrollee in the Plan.  The Decedent was injured in an accident in 1997.  Plan payments for the medical care he received between 1997 and his death in 2001 amounted to $157,309.  McVeigh, on behalf of herself, the Decedent, and a minor child, commenced tort litigation in state court against parties alleged to have caused Decedent's injuries.  On learning that the parties to the state-court litigation had agreed to settle the tort claims, Empire sought to recover the $157,309 it had paid out for the Decedent's medical care.[2]  Of the $3,175,000 for which the settlement

--------

[2]At oral argument, counsel for respondent McVeigh represented that "most of the [reimbursement claims] are not of th[is] magnitude";

provided, McVeigh, in response to Empire's asserted reimbursement right, agreed to place $100,000 in escrow.

Empire then filed suit in the United States District Court for the Southern District of New York, alleging that McVeigh was in breach of the reimbursement provision of the Plan. As relief, Empire demanded $157,309, with no offset for attorney's fees or other litigation costs McVeigh incurred in pursuing the state-court settlement. McVeigh moved to dismiss on various grounds, among them, lack of subject-matter jurisdiction. See 396 F. 3d 136, 139 (CA2 2005). Answering McVeigh's motion, Empire urged that the District Court had jurisdiction under 28 U. S. C. §1331 because federal common law governed its reimbursement claim. In the alternative, Empire asserted that the Plan itself constituted federal law. See 396 F. 3d, at 140. The District Court rejected both arguments and granted McVeigh's motion to dismiss for want of subject-matter jurisdiction. *Ibid.*

A divided panel of the Court of Appeals for the Second Circuit affirmed, holding that "Empire's clai[m] arise[s] under state law." *Id.*, at 150. FEHBA's text, the court observed, contains no authorization for carriers "to vindicate [in federal court] their rights [against enrollees] under FEHBA-authorized contracts"; therefore, the court concluded, "federal jurisdiction exists over this dispute only if federal common law governs Empire's claims." *Id.*, at 140. Quoting *Boyle* v. *United Technologies Corp.,* 487 U. S. 500, 507, 508 (1988), the appeals court stated that courts may create federal common law only when "the operation of state law would (1) 'significant[ly] conflict' with (2) 'uniquely federal interest[s].'" 396 F. 3d, at 140.

Empire maintained that its contract-derived claim against McVeigh implicated "uniquely federal interest[s],"

"[m]ost of the cases involve [amounts like] $5,500 and $6,500." Tr. of Oral Arg. 52.

because (1) reimbursement directly affects the United States Treasury and the cost of providing health benefits to federal employees; and (2) Congress had expressed its interest in maintaining uniformity among the States on matters relating to federal health-plan benefits. *Id.*, at 141. The court acknowledged that the case involved distinctly federal interests, but found that Empire had not identified "specific ways in which the operation of state contract law, or indeed of other laws of general application, would conflict materially with the federal policies underlying FEHBA in the circumstances presented." *Id.*, at 150 (Sack, J., concurring); see *id.*, at 142.

The Court of Appeals next considered and rejected Empire's argument that FEHBA's preemption provision, 5 U. S. C. §8902(m)(1), independently conferred federal jurisdiction. 396 F. 3d, at 145–149. That provision, the court observed, is "a limited preemption clause that the instant dispute does not trigger." *Id.*, at 145. Unlike §8912, which "authoriz[es] federal jurisdiction over FEHBA-related . . . claims '*against the United States*,'" the court noted, §8902(m)(1) "makes no reference to a federal right of action [in] or to federal jurisdiction [over]" the contract-derived reimbursement claim here at issue. 396 F. 3d, at 145, and n. 7.

Judge Raggi dissented. *Id.*, at 151. In her view, FEHBA's preemption provision, §8902(m)(1), as amended in 1998, both calls for the application of uniform federal common law to terms in a FEHBA plan and establishes federal jurisdiction over Empire's complaint.

We granted certiorari, 546 U. S. ___ (2005), to resolve a conflict among lower federal courts concerning the proper forum for claims of the kind Empire asserts. Compare *Blue Cross & Blue Shield of Illinois* v. *Cruz*, 396 F. 3d 793, 799–800 (CA7 2005) (upholding federal jurisdiction), *Caudill* v. *Blue Cross & Blue Shield of North Carolina*, 999 F. 2d 74, 77 (CA4 1993) (same), and *Medcenters Health*

*Care* v. *Ochs,* 854 F. Supp. 589, 593, and n. 3 (Minn. 1993) (same), aff'd, 26 F. 3d 865 (CA8 1994), with *Goepel* v. *Nat. Postal Mail Handlers Union*, 36 F. 3d 306, 314–315 (CA3 1994) (rejecting federal jurisdiction), and 396 F. 3d, at 139 (decision below) (same).

### III

Title 28 U. S. C. §1331 vests in federal district courts "original jurisdiction" over "all civil actions arising under the Constitution, laws, or treaties of the United States." A case "aris[es] under" federal law within the meaning of §1331, this Court has said, if "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of Cal.* v. *Construction Laborers Vacation Trust for Southern Cal.,* 463 U. S. 1, 27–28 (1983).

Empire and the United States, as *amicus curiae*, present two principal arguments in support of federal-question jurisdiction. Emphasizing our opinion in *Jackson Transit Authority* v. *Transit Union,* 457 U. S. 15, 22 (1982), and cases cited therein, they urge that Empire's complaint raises a federal claim because it seeks to vindicate a contractual right contemplated by a federal statute, a right that Congress intended to be federal in nature. See Brief for Petitioner 14–31; Brief for United States 12–23. FEHBA's preemption provision, Empire and the United States contend, demonstrates Congress' intent in this regard. The United States argues, alternatively, that there is federal jurisdiction here, as demonstrated by our recent decision in *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Mfg.,* 545 U. S. 308 (2005), because "federal law is a necessary element of [Empire's] claim." Brief for United States 25; accord Brief for Petitioner 41, n. 5. We address these arguments in turn. But first, we

respond to the dissent's view that Empire and the United States have engaged in unnecessary labor, for *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943), provides "a basis for federal jurisdiction in this case." *Post*, at 1.

A

*Clearfield* is indeed a pathmarking precedent on the authority of federal courts to fashion uniform federal common law on issues of national concern. See Friendly, In Praise of *Erie*—and of the New Federal Common Law, 39 N. Y. U. L. Rev. 383, 409–410 (1964). But the dissent is mistaken in supposing that the *Clearfield* doctrine covers this case. *Clearfield* was a suit by the United States to recover from a bank the amount paid on a Government check on which the payee's name had been forged. 318 U. S., at 365. Because the United States was the plaintiff, federal-court jurisdiction was solidly grounded. See *ibid.* ("This suit was instituted . . . by the United States . . . , the jurisdiction of the federal District Court being invoked pursuant to the provisions of §24(1) of the Judicial Code, 28 U. S. C. §41(1)," now contained in 28 U. S. C. §§1332, 1345, 1359). The case presented a vertical choice-of-law issue: Did state law under *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), or a court-fashioned federal rule of decision (federal common law) determine the merits of the controversy? The Court held that "[t]he rights and duties of the United States on commercial paper which it issues are governed by federal rather than [state] law." 318 U. S., at 366.

In post-*Clearfield* decisions, and with the benefit of enlightened commentary, see, *e.g.*, Friendly, *supra*, at 410, the Court has "made clear that uniform federal law need not be applied to all questions in federal government litigation, even in cases involving government contracts," R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 700 (5th ed. 2003)

(hereinafter Hart and Wechsler).[3]  "[T]he prudent course," we have recognized, is often "to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation."  *United States* v. *Kimbell Foods, Inc.,* 440 U. S. 715, 740 (1979).

Later, in *Boyle*, the Court telescoped the appropriate inquiry, focusing it on the straightforward question whether the relevant federal interest warrants displacement of state law.  See 487 U. S., at 507, n. 3.  Referring simply to "the displacement of state law," the Court recognized that prior cases had treated discretely (1) the competence of federal courts to formulate a federal rule of decision, and (2) the appropriateness of declaring a federal rule rather than borrowing, incorporating, or adopting state law in point. The Court preferred "the more modest terminology," questioning whether "the distinction between displacement of state law and displacement of federal law's incorporation of state law ever makes a practical difference."  *Ibid.  Boyle* made two further observations here significant.  First, *Boyle* explained, the involvement of "an area of uniquely federal interest . . . establishes a necessary, not a sufficient, condition for the displacement of state law."  *Id.*, at 507.  Second, in some cases, an "entire body of state law" may conflict with the federal interest and therefore require replacement.  *Id.*, at 508.  But in others, the conflict is confined, and "only

—————

[3] The United States, in accord with the dissent in this regard, see *post*, at 6, several times cites *United States* v. *County of Allegheny,* 322 U. S. 174 (1944), see, *e.g.*, Brief as *Amicus Curiae* 10, 15, 26, maintaining that the construction of a federal contract "necessarily present[s] questions of 'federal law not controlled by the law of any State,' " *id.*, at 26 (quoting 322 U. S., at 183).  *Allegheny* does not stretch as widely as the United States suggests.  That case concerned whether certain property belonged to the United States and, if so, whether the incidence of a state tax was on the United States or on a Government contractor.  See *id.*, at 181–183, 186–189.  Neither the United States nor any United States agency is a party to this case, and the auxiliary matter here involved scarcely resembles the controversy in *Allegheny*.

particular elements of state law are superseded." *Ibid.*

The dissent describes this case as pervasively federal, *post*, at 1, and "the provisions . . . here [as] just a few scattered islands in a sea of federal contractual provisions," *post*, at 9. But there is nothing "scattered" about the provisions on reimbursement and subrogation in the OPM-BCBSA master contract. See *supra*, at 3–4. Those provisions are linked together and depend upon a recovery from a third party under terms and conditions ordinarily governed by state law. See *infra*, at 17.[4] The Court of Appeals, whose decision we review, trained on the matter of reimbursement, not, as the dissent does, on FEHBA-authorized contracts at large. So focused, the appeals court determined that Empire has not demonstrated a "significant conflict . . . between an identifiable federal policy or interest and the operation of state law." 396 F. 3d, at 150 (Sack, J., concurring), quoting *Boyle*, 487 U. S., at 507)); see 396 F. 3d, at 140–141. Unless and until that showing is made, there is no cause to displace state law, much less to lodge this case in federal court.

B

We take up next Empire's *Jackson Transit*-derived argument, which is, essentially, a more tailored variation of the theme sounded in the dissent. It is undisputed that Congress has not expressly created a federal right of action enabling insurance carriers like Empire to sue health-care beneficiaries in federal court to enforce reimbursement rights under contracts contemplated by FEHBA. Empire and the United States nevertheless argue that, under our 1982 opinion in *Jackson Transit*, Empire's claim for reimbursement, arising under the contract between OPM and BCBSA, "states a federal claim" because Congress in-

_____

[4] The dissent nowhere suggests that uniform, court-declared federal law would govern the carrier's subrogation claim against the tortfeasor. Nor does the dissent explain why the two linked provisions— reimbursement and subrogation—should be decoupled.

tended all rights and duties stemming from that contract to be "federal in nature." Brief for United States as *Amicus Curiae* 12; see Brief for Petitioner 18–29. We are not persuaded by this argument.

The reliance placed by Empire and the United States on *Jackson Transit* is surprising, for that decision held there was no federal jurisdiction over the claim in suit. The federal statute there involved, §13(c) of the Urban Mass Transportation Act of 1964 (UMTA), 78 Stat. 307 (then codified at 49 U. S. C. §1609(c) (1976 ed.)), conditioned a governmental unit's receipt of federal funds to acquire a privately owned transit company on preservation of collective-bargaining rights enjoyed by the acquired company's employees. 457 U. S., at 17–18. The city of Jackson, Tennessee, with federal financial assistance, acquired a failing private bus company and turned it into a public entity, the Jackson Transit Authority. *Id.*, at 18. To satisfy the condition on federal aid, the transit authority entered into a "§13(c) agreement" with the union that represented the private company's employees, and the Secretary of Labor certified that agreement as "fair and equitable." *Ibid.* (internal quotation marks omitted).

For several years thereafter, the transit authority covered its unionized workers in a series of collective-bargaining agreements. Eventually, however, the Authority notified the union that it would no longer adhere to collective-bargaining undertakings. *Id.*, at 19. The union commenced suit in federal court alleging breach of the §13(c) agreement and of the latest collective-bargaining agreement. *Ibid.* This Court determined that the case did not arise under federal law, but was instead "governed by state law [to be] applied in state cour[t]." *Id.*, at 29.

The Court acknowledged in *Jackson Transit* that "on several occasions [we had] determined that a plaintiff stated a federal claim when he sued to vindicate contractual rights *set forth by federal statutes*, [even though] the

relevant statutes lacked express provisions creating federal causes of action." *Id.*, at 22 (emphasis added) (citing *Machinists* v. *Central Airlines, Inc.,* 372 U. S. 682 (1963) (union had a federal right of action to enforce an airline-adjustment-board award included in a collective-bargaining contract pursuant to a provision of the Railway Labor Act); *Norfolk & Western R. Co.* v. *Nemitz,* 404 U. S. 37 (1971) (railroad's employees stated federal claims when they sought to enforce assurances made by the railroad to secure Interstate Commerce Commission approval of a consolidation under a provision of the Interstate Commerce Act); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 18–19 (1979) (permitting federal suit for rescission of a contract declared void by a provision of the Investment Advisers Act of 1940)). But prior decisions, we said, "d[id] not dictate the result in [the *Jackson Transit*] case," for in each case, "the critical factor" in determining "the scope of rights and remedies under a federal statute . . . is the congressional intent behind the particular provision at issue." 457 U. S., at 22.

"In some ways," the *Jackson Transit* Court said, the UMTA "seem[ed] to make §13(c) agreements and collective-bargaining contracts creatures of federal law." *Id.*, at 23. In this regard, the Court noted, §13(c)

> "demand[ed] 'fair and equitable arrangements' as prerequisites for federal aid; it require[d] the approval of the Secretary of Labor for those arrangements; it specifie[d] five different varieties of protective provisions that must be included among the §13(c) arrangements; and it expressly incorporate[d] the protective arrangements into the grant contract between the recipient and the Federal Government." *Ibid.* (quoting 49 U. S. C. §1609(c) (1976 ed.)).

But there were countervailing considerations. The Court observed that "labor relations between local gov-

ernments and their employees are the subject of a long-standing statutory exemption from the National Labor Relations Act." 457 U. S., at 23. "Section 13(c)," the Court continued, "evince[d] no congressional intent to upset the decision in the [NLRA] to permit state law to govern the relationships between local governmental entities and the unions representing their employees." *Id.*, at 23–24. Legislative history was corroborative. "A consistent theme," the Court found, "[ran] throughout the consideration of §13(c): Congress intended that labor relations between transit workers and local governments would be controlled by state law." *Id.*, at 24. We therefore held that the union had come to the wrong forum. Congress had indeed provided for §13(c) agreements and collective-bargaining contracts stemming from them, but in the Court's judgment, the union's proper recourse for enforcement of those contracts was a suit in state court.

Measured against the Court's discussion in *Jackson Transit* about when a claim arises under federal law, Empire's contract-derived claim for reimbursement is not a "creatur[e] of federal law." *Id.*, at 23. True, distinctly federal interests are involved. Principally, reimbursements are credited to a federal fund, and the OPM-BCBSA master contract could be described as "federal in nature" because it is negotiated by a federal agency and concerns federal employees. See *supra*, at 2–3. But, as in *Jackson Transit*, countervailing considerations control. Among them, the reimbursement right in question, predicated on a FEHBA-authorized contract, is not a prescription of federal law. See *supra*, at 3. And, of prime importance, "Congress considered jurisdictional issues in enacting FEHBA[,]. . . confer[ring] federal jurisdiction where it found it necessary to do so." 396 F. 3d, at 145, n. 7.

FEHBA's jurisdictional provision, 5 U. S. C. §8912, opens the federal district-court door to civil actions "against the United States." See *supra*, at 5. OPM's regu-

lation, 5 CFR §890.107(c) (2005), instructs enrollees who seek to challenge benefit denials to proceed in court against OPM "and not against the carrier or carrier's subcontractors." See *supra*, at 6. Read together, these prescriptions "ensur[e] that suits brought by beneficiaries for denial of benefits will land in federal court." 396 F. 3d, at 145, n. 7. Had Congress found it necessary or proper to extend federal jurisdiction further, in particular, to encompass contract-derived reimbursement claims between carriers and insured workers, it would have been easy enough for Congress to say so. Cf. 29 U. S. C. §1132(a)(3) (authorizing suit in federal court "by a participant, beneficiary, or fiduciary" of a pension or health plan governed by ERISA to gain redress for violations of "this subchapter or the terms of the plan"). We have no warrant to expand Congress' jurisdictional grant "by judicial decree." See *Kokkonen* v. *Guardian Life Ins. Co. of America,* 511 U. S. 375, 377 (1994).

*Jackson Transit*, Empire points out, referred to decisions "demonstrat[ing] that . . . private parties in appropriate cases may sue in federal court to enforce contractual rights created by federal statutes." 457 U. S., at 22. See Brief for Petitioner 15. This case, however, involves no right created by federal statute. As just reiterated, while the OPM-BCBSA master contract provides for reimbursement, FEHBA's text itself contains no provision addressing the reimbursement or subrogation rights of carriers.

Nor do we read 5 U. S. C. §8902(m)(1), FEHBA's preemption prescription, see *supra*, at 4–5, as a jurisdiction-conferring provision. That choice-of-law prescription is unusual in that it renders preemptive contract terms in health insurance plans, not provisions enacted by Congress. See 396 F. 3d, at 143–145; *id.*, at 151 (Sack, J., concurring). A prescription of that unusual order warrants cautious interpretation.

Section 8902(m)(1) is a puzzling measure, open to more

than one construction, and no prior decision seems to us precisely on point. Reading the reimbursement clause in the master OPM-BCBSA contract as a condition or limitation on "benefits" received by a federal employee, the clause could be ranked among "[contract] terms . . . relat[ing] to . . . coverage or benefits" and "payments with respect to benefits," thus falling within §8902(m)(1)'s compass. See Brief for United States as *Amicus Curiae* 20; Reply Brief 8–9. On the other hand, a claim for reimbursement ordinarily arises long after "coverage" and "benefits" questions have been resolved, and corresponding "payments with respect to benefits" have been made to care providers or the insured. With that consideration in view, §8902(m)(1)'s words may be read to refer to contract terms relating to the *beneficiary's* entitlement (or lack thereof) to Plan payment for certain health-care services he or she has received, and not to terms relating to the carrier's post-payments right to reimbursement. See Brief for Julia Cruz as *Amicus Curiae* 10, 11.

To decide this case, we need not choose between those plausible constructions. If contract-based reimbursement claims are not covered by FEHBA's preemption provision, then federal jurisdiction clearly does not exist. But even if FEHBA's preemption provision reaches contract-based reimbursement claims, that provision is not sufficiently broad to confer federal jurisdiction. If Congress intends a preemption instruction completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear. Cf. *Columbus* v. *Ours Garage & Wrecker Service, Inc.,* 536 U. S. 424, 432–433 (2002) (citing *Wisconsin Public Intervenor* v. *Mortier,* 501 U. S. 597, 605 (1991)). Congress has not done so here.

Section 8902(m)(1)'s text does not purport to render inoperative *any and all* State laws that in some way bear on federal employee-benefit plans. Cf. 29 U. S. C. §1144(a)

(portions of ERISA "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan"). And, as just observed, see *supra*, at 14, given that §8902(m)(1) declares no federal law preemptive, but instead, terms of an OPM-BCBSA negotiated contract, a modest reading of the provision is in order. Furthermore, a reimbursement right of the kind Empire here asserts stems from a personal-injury recovery, and the claim underlying that recovery is plainly governed by state law. We are not prepared to say, based on the presentations made in this case, that under §8902(m)(1), an OPM-BCBSA contract term would displace every condition state law places on that recovery.

As earlier observed, the BCBSA Plan's statement of benefits links together the carrier's right to reimbursement from the insured and its right to subrogation. See *supra*, at 3–4. Empire's subrogation right allows the carrier, once it has paid an insured's medical expenses, to recover directly from a third party responsible for the insured's injury or illness. See 16 G. Couch, Cyclopedia of Insurance Law §61:1 (2d ed. 1982). Had Empire taken that course, no access to a federal forum could have been predicated on the OPM-BCBSA contract right. The tortfeasors' liability, whether to the insured or the insurer, would be governed not by an agreement to which the tortfeasors are strangers, but by state law, and §8902(m)(1) would have no sway.

In sum, the presentations before us fail to establish that §8902(m)(1) leaves no room for any state law potentially bearing on federal employee-benefit plans in general, or carrier-reimbursement claims in particular. Accordingly, we extract from §8902(m)(1) no prescription for federal-court jurisdiction.

## C

We turn finally to the argument that Empire's reim-

bursement claim, even if it does not qualify as a "cause of action created by federal law," nevertheless arises under federal law for §1331 purposes, because federal law is "a necessary element of the [carrier's] claim for relief." Brief for United States as *Amicus Curiae* 25–26 (quoting *Grable,* 545 U. S., at 312, and *Jones* v. *R. R. Donnelley & Sons Co.,* 541 U. S. 369, 376 (2004)). This case, we are satisfied, does not fit within the special and small category in which the United States would place it. We first describe *Grable*, a recent decision that the United States identifies as exemplary,[5] and then explain why this case does not resemble that one.

*Grable* involved real property belonging to Grable & Sons Metal Products, Inc. (Grable), which the Internal Revenue Service (IRS) seized to satisfy a federal tax deficiency. 545 U. S., at 310. Grable received notice of the seizure by certified mail before the IRS sold the property to Darue Engineering & Manufacturing (Darue). *Ibid.* Five years later, Grable sued Darue in state court to quiet title. Grable asserted that Darue's record title was invalid because the IRS had conveyed the seizure notice improperly. *Id.*, at 311. The governing statute, 26 U. S. C. §6335(a), provides that "notice in writing shall be given . . . to the owner of the property . . . or shall be left at his usual place of abode or business . . . ." Grable maintained that §6335(a) required personal service, not service by certified mail. 545 U. S., at 311.

Darue removed the case to federal court. Alleging that Grable's claim of title depended on the interpretation of a federal statutory provision, *i.e.*, §6335(a) of the Internal Revenue Code, Darue invoked federal-question jurisdiction under 28 U. S. C. §1331. We affirmed lower court deter-

———————

[5] As the Court in *Grable* observed, 545 U. S., at 312, the classic example of federal-question jurisdiction predicated on the centrality of a federal issue is *Smith* v. *Kansas City Title & Trust Co.,* 255 U. S. 180 (1921).

minations that the removal was proper. "The meaning of the federal tax provision," we said, "is an important issue of federal law that sensibly belongs in a federal court." 545 U. S., at 315. Whether Grable received notice adequate under §6335(a), we observed, was "an essential element of [Grable's] quiet title claim"; indeed, "it appear[ed] to be the only . . . issue contested in the case." *Ibid.*

This case is poles apart from *Grable.* Cf. Brief for United States as *Amicus Curiae* 27. The dispute there centered on the action of a federal agency (IRS) and its compatibility with a federal statute, the question qualified as "substantial," and its resolution was both dispositive of the case and would be controlling in numerous other cases. See *id.*, at 313. Here, the reimbursement claim was triggered, not by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court, see *supra*, at 6–7, and the bottom-line practical issue is the share of that settlement properly payable to Empire.

*Grable* presented a nearly "pure issue of law," one "that could be settled once and for all and thereafter would govern numerous tax sale cases." Hart and Wechsler 65 (2005 Supp.). In contrast, Empire's reimbursement claim, McVeigh's counsel represented without contradiction, is fact-bound and situation-specific. McVeigh contends that there were overcharges or duplicative charges by care providers, and seeks to determine whether particular services were properly attributed to the injuries caused by the 1997 accident and not rendered for a reason unrelated to the accident. See Tr. of Oral Arg. 44, 53.

The United States observes that a claim for reimbursement may also involve as an issue "[the] extent, if any, to which the reimbursement should take account of attorney's fees expended . . . to obtain the tort recovery." Brief as *Amicus Curiae* 29. Indeed it may. But it is hardly

apparent why a proper "federal-state balance," see *id.*, at 28, would place such a nonstatutory issue under the complete governance of federal law, to be declared in a federal forum. The state court in which the personal-injury suit was lodged is competent to apply federal law, to the extent it is relevant, and would seem best positioned to determine the lawyer's part in obtaining, and his or her fair share in, the tort recovery.

The United States no doubt "has an overwhelming interest in attracting able workers to the federal workforce," and "in the health and welfare of the federal workers upon whom it relies to carry out its functions." *Id.*, at 10. But those interests, we are persuaded, do not warrant turning into a discrete and costly "federal case" an insurer's contract-derived claim to be reimbursed from the proceeds of a federal worker's state-court-initiated tort litigation.

In sum, *Grable* emphasized that it takes more than a federal element "to open the 'arising under' door." 545 U. S., at 313. This case cannot be squeezed into the slim category *Grable* exemplifies.

\*    \*    \*

For the reasons stated, the judgment of the Court of Appeals for the Second Circuit is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

No. 05–200

EMPIRE HEALTHCHOICE ASSURANCE, INC., DBA
EMPIRE BLUE CROSS BLUE SHIELD, PETITIONER
*v.* DENISE F. MCVEIGH, AS ADMINISTRATRIX OF THE
ESTATE OF JOSEPH E. MCVEIGH

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 15, 2006]

JUSTICE BREYER, with whom JUSTICE KENNEDY,
JUSTICE SOUTER, and JUSTICE ALITO join, dissenting.

This case involves a dispute about the meaning of terms
in a federal health insurance contract. The contract,
between a federal agency and a private carrier, sets forth
the details of a federal health insurance program created
by federal statute and covering 8 million federal employ-
ees. In all this the Court cannot find a basis for federal
jurisdiction. I believe I can. See *Clearfield Trust Co.* v.
*United States*, 318 U. S. 363 (1943).

I

A

There is little about this case that is not federal. The
comprehensive federal health insurance program at issue
is created by a federal statute, the Federal Employees
Health Benefits Act of 1959 (FEHBA), 5 U. S. C. §8901 *et
seq* (2000 ed. and Supp. III). This program provides in-
surance for Federal Government employees and their
families. That insurance program today covers approxi-
mately 8 million federal employees, retirees, and depend-
ents, at a total cost to the Government of about $22 billion
a year. Brief for United States as *Amicus Curiae* 2.

To implement the statute, the Office of Personal Management (OPM), the relevant federal agency, enters into contracts with a handful of major insurance carriers. These agency/carrier contracts follow a standard agency form of about 38,000 words, and contain the details of the plan offered by the carrier. See §8902(d) (2000 ed.) (requiring contract between carrier and agency to contain a detailed statement of the terms of the plan); see also Federal Employees Health Benefits Program Standard Contract (CR–2003) (2005), available at http://www.opm.gov/insure/carriers/sample contract.doc (sample form agency/carrier contract) (all Internet materials as visited June 7, 2006, and available in Clerk of Court's case file). The contract lists, for example, the benefits provided to the employees who enroll. It provides a patient's bill of rights. It makes clear that the Government, not the carrier, will receive the premiums and will pay the benefits. It specifies that the carrier will administer the program that the contract sets forth, for which the carrier will receive an adjustable fee. The contract also states, "By enrolling or accepting services under this contract, [enrollees] are obligated to all terms, conditions, and provisions of this contract." App. 90.

As the statute requires, §8907(b), the agency/carrier contract also provides that the carrier will send each enrolled employee a brochure that explains the terms of the plan, as set forth in the contract. The brochure explains that it "describes the benefits of the . . . [p]lan under [the carrier's] contract . . . with [the federal agency], as authorized by the [federal statute]." *Id.*, at 158. The terms of the brochure are incorporated into the agency/carrier contract. *Id.*, at 89. The carrier distributes the brochure with a seal attached to the front stating, "Authorized for distribution by the United States Office of Personnel Management Retirement and Insurance Service." *Id.*, at 155.

The program is largely funded by the Federal Govern-

ment. More specifically, the Federal Government pays about 75% of the plan premiums; the enrollee pays the rest. §8906(b). These premiums are deposited into a special fund in the United States Treasury. §8909(a). The carrier typically withdraws money from the fund to pay for covered health care services, *ibid.*; however, the fund's money belongs, not to the carrier, but to the federal agency that administers the program. After benefits are paid, any surplus in the fund can be used at the agency's discretion to reduce premiums, to increase plan benefits, or to make a refund to the Government and enrollees. §8909(b); 5 CFR §890.503(c)(2) (2005). The carrier is not at risk. Rather, it earns a profit, not from any difference between plan premiums and the cost of benefits, but from a negotiated service charge that the federal agency pays directly.

Federal regulations provide that the federal agency will resolve disputes about an enrolled employee's coverage. §890.105(a)(1); see also 5 U. S. C. §8902(j) (requiring carrier to provide health benefit if OPM concludes that enrollee is entitled to the benefit under the contract). The agency's resolution is judicially reviewable under the Administrative Procedure Act in federal court. 5 CFR §890.107 (2005).

In sum, the statute is federal, the program it creates is federal, the program's beneficiaries are federal employees working throughout the country, the Federal Government pays all relevant costs, and the Federal Government receives all relevant payments. The private carrier's only role in this scheme is to administer the health benefits plan for the federal agency in exchange for a fixed service charge.

B

The plan at issue here, the Blue Cross Blue Shield Service Benefit Plan, is the largest in the statutory pro-

gram.  The plan's details are contained in Blue Cross Blue Shield's contract with the federal agency and in the brochure, which binds the enrolled employee to that contract. In this case, the carrier seeks to require the enrolled employee's estate to abide by provisions that permit the carrier to obtain (and require the enrolled employee to pay) reimbursement from an enrollee for benefits provided if the enrollee recovers money from a third party (as compensation for the relevant injury or illness).  The parties dispute the proper application of some of those provisions.

First, the agency's contract with the carrier requires the carrier to "mak[e] a reasonable effort to seek recovery of amounts to which it is entitled to recover." App. 95.  And the carrier must do so "under a single, nation-wide policy to ensure equitable and consistent treatment for all [enrollees] under this contract." *Ibid.*  Any money recovered by the carrier goes into the statutory fund in the United States Treasury, and may be spent for the benefit of the program at the discretion of the federal agency.  See *supra*, at 3.

Second, the agency/carrier contract and the brochure set forth the enrollee's obligation to reimburse the carrier under certain circumstances.  The contract states, "The Carrier may . . . recover directly from the [enrollee] all amounts received by the [enrollee] by suit, settlement, or otherwise from any third party or its insurer . . . for benefits which have also been paid under this contract."  App. 95.  The agency/carrier contract also says that the "[c]arrier's subrogation rights, procedures and policies, including recovery rights, shall be in accordance with the provisions of the agreed-upon brochure text."  *Id.*, at 100.  The relevant provisions in the brochure (which also appear in the appendix to the agency/carrier contract) tell the enrollee:

> "If another person or entity, through an act or omission, causes you to suffer an injury or illness, and if

we pay benefits for that injury or illness, you must agree to the following:

"All recoveries you obtain (whether by lawsuit, settlement, or otherwise), no matter how described or designated, must be used to reimburse us in full for benefits we paid. . . .

"We will not reduce our share of any recovery unless we agree in writing to a reduction, . . . because you had to pay attorneys' fees." *Id.*, at 165.

The enrollee must abide by these requirements because, as explained above, the brochure tells the beneficiary that, by enrolling in the program, he or she is agreeing to the terms of the brochure, which in turn "describes the benefits of the [plan] under [the agency/carrier] contract." *Id.*, at 158.

## II
### A

I have explained the nature of the program and have set forth the terms of the agency/carrier contract in some detail because, once understood, their federal nature brings this case well within the scope of the relevant federal jurisdictional statute, 28 U. S. C. §1331, which provides jurisdiction for claims "arising under" federal law. For purposes of this statute, a claim arises under federal law if federal law creates the cause of action. *Merrell Dow Pharmaceuticals Inc.* v. *Thompson*, 478 U. S. 804, 808 (1986); see also *American Well Works Co.* v. *Layne & Bowler Co.*, 241 U. S. 257, 260 (1916) (opinion of Holmes, J.) (A "suit arises under the law that creates the cause of action"). And this Court has explained that §1331's "statutory grant of 'jurisdiction will support claims founded upon federal common law as well as those of a statutory origin.'" *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845, 850 (1985); see also *Illinois* v. *Milwaukee*, 406 U. S. 91 (1972); C. Wright, A. Miller, & E.

Cooper, Federal Practice and Procedure §4514, p. 455 (2d ed. 1996) ("A case 'arising under' federal common law presents a federal question and as such is within the original subject-matter jurisdiction of the federal courts"). In other words, "[f]ederal common law as articulated in rules that are fashioned by court decisions are 'laws' as that term is used in §1331." *National Farmers*, *supra*, at 850.

It seems clear to me that the petitioner's claim arises under federal common law. The dispute concerns the application of terms in a federal contract. This Court has consistently held that "obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 504 (1988). This principle dates back at least as far as *Clearfield Trust*, 318 U. S., at 366, where the Court held that the "rights and duties of the United States on [federal] commercial paper," namely a federal employee's paycheck, "are governed by federal rather than local law." The Court reasoned that "[w]hen the United States disburses its funds or pays its debts, it is exercising a constitutional function or power," a power "in no way dependent on the laws of Pennsylvania or of any other state." *Ibid.* Accordingly, "[i]n [the] absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law." *Id.*, at 367.

This Court has applied this principle, the principle embodied in *Clearfield Trust,* to Government contracts of all sorts. See, *e.g.*, *West Virginia* v. *United States*, 479 U. S. 305, 308–309 (1987) (contract regarding federal disaster relief efforts); *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 726 (1979) (contractual liens arising from federal loan programs); *United States* v. *Little Lake Misere Land Co.*, 412 U. S. 580, 592 (1973) (agreements to acquire land under federal conservation program); *United States* v. *Seckinger*, 397 U. S. 203, 209 (1970) (Government

construction contracts); *United States* v. *County of Allegheny*, 322 U. S. 174, 183 (1944) (Government procurement contracts).

In this case, the words that provide the right to recover are contained in the brochure, which in turn explains the provisions of the contract between the Government and the carrier, provisions that were written by a federal agency acting pursuant to a federal statute that creates a federal benefit program for federal employees. At bottom, then, the petitioner's claim is based on the interpretation of a federal contract, and as such should be governed by federal common law. And because the petitioner's claim is based on federal common law, the federal courts have jurisdiction over it pursuant to §1331. The lower federal courts have similarly found §1331 jurisdiction over suits between private parties based on Federal Government contracts. See, *e.g.*, *Downey* v. *State Farm Fire & Casualty Co.*, 266 F. 3d 675, 680–681 (CA7 2001) (Easterbrook, J.) (National Flood Insurance Program contracts); *Almond* v. *Capital Properties, Inc.*, 212 F. 3d 20, 22–24 (CA1 2000) (Boudin, J.) (Federal Railroad Administration contract); *Price* v. *Pierce*, 823 F. 2d 1114, 1119–1120 (CA7 1987) (Posner, J.) (Dept. of Housing and Urban Development contracts).

## B

What might one say to the contrary? First, I may have made too absolute a statement in claiming that disputes arising under federal common law are (for jurisdictional purposes) cases "arising under" federal law. After all, in every Supreme Court case I have cited (except *National Farmers* and *Milwaukee*, and not including the Court of Appeals cases), the United States was a party, and that fact provides an independent basis for jurisdiction. See 28 U. S. C. §§1345, 1346(a)(2), 1491(a)(1). In those cases the decision to apply federal common law was, therefore, a

"choice-of-law issue" only, *ante*, at 10, and the Court consequently did not need to address the application of the *Clearfield Trust* doctrine to §1331 "arising under" jurisdiction.

But I have found no case where a federal court concluded that federal common law governed a plaintiff's contract claim but nevertheless decided that the claim did not arise under federal law. I have found several lower court cases (cited *supra,* at 7) where courts asserted §1331 jurisdiction solely on the basis of federal common law. And in *Machinists* v. *Central Airlines, Inc.*, 372 U. S. 682, 693, n. 17 (1963), this Court cited the *Clearfield Trust* cases in finding §1331 jurisdiction over the contract suit before it, noting that although those cases "did not involve federal jurisdiction as such," nevertheless "they are suggestive" on the issue of §1331 jurisdiction over suits involving Federal Government contracts "since they hold federal law determinative of the merits of the claim."

It is enough here, however, to assume that federal common law means federal jurisdiction where Congress so intends. Cf. *Clearfield Trust*, *supra*, at 367 ("*In absence of an applicable Act of Congress* it is for the federal courts to fashion the governing rule of law according to their own standards" (emphasis added)). If so, there are strong reasons for the federal courts, following *Clearfield Trust*, to assume jurisdiction and apply federal common law to resolve this case.

First, although the nominal plaintiff in this case is the carrier, the real party in interest is the United States. Any funds that the petitioner recovers here it must pay directly to the United States, by depositing those funds in the FEHBA United States Treasury account managed by the federal agency. The carrier simply administers the reimbursement proceeding for the United States, just as it administers the rest of the agency/carrier contract. Accordingly, this case, just like the *Clearfield Trust* cases, concerns the "rights of the United States under its con-

tracts." *Boyle,* 487 U. S., at 504.

Second, the health insurance system FEHBA establishes is a federal program. The Federal Government pays for the benefits, receives the premiums, and resolves disputes over claims for medical services. Given this role, the Federal Government's need for uniform interpretation of the contract is great. Given the spread of Government employees throughout the Nation and the unfairness of treating similar employees differently, the employees' need for uniform interpretation is equally great. That interest in uniformity calls for application of federal common law to disputes about the meaning of the words in the agency/carrier contract and brochure. See *Clearfield Trust,* 318 U. S., at 367 (applying federal common law because the "desirability of a uniform [federal] rule is plain"); see also *Bank of America Nat. Trust & Sav. Assn.* v. *Parnell,* 352 U. S. 29, 33, 34 (1956) ("[L]itigation with respect to Government paper . . . between private parties" may nevertheless "be governed by federal [common] law" where there is "the presence of a federal interest"). And that interest in uniformity also suggests that the doors of the federal courts should be open to decide such disputes.

Third, as discussed above, the provisions at issue here are just a few scattered islands in a sea of federal contractual provisions, all of which federal courts will interpret and apply (when reviewing the federal agency's resolution of disputes regarding benefits). Given this context, why would Congress have wanted the courts to treat those islands any differently? I can find no convincing answer.

Regardless, the majority and the Court of Appeals believe they have come up with one possible indication of a contrary congressional intent. They believe that the statute's jurisdictional provision argues against federal jurisdiction where the United States is not formally a party. That provision gives the federal district courts "original jurisdiction, concurrent with the United States Court of

Federal Claims, of a civil action or claim against the United States founded on this chapter." 5 U. S. C. §8912. According to the majority, if Congress had wanted cases like this one to be brought in the federal courts, it would have extended §8912 to cover them. *Ante*, at 15–16.

That is not so. Congress' failure to write §8912 to include suits between carriers and enrollees over plan provisions may reflect inadvertence. Or it may reflect a belief that §1331 covered such cases regardless. Either way, §8912 tells us nothing about Congress' intent in respect to §1331 jurisdiction.

But why then did Congress write §8912 at all? After all, the cases there covered—contract claims against the Federal Government "founded on" the federal health insurance program—would also be governed by federal common law and (if my view is correct) would have fallen within the scope of §1331. What need would there have been (if my view is correct) to write a special section, §8912, expanding federal jurisdiction to encompass these claims?

The answer, as the majority itself points out, *ante*, at 5, is that Congress did not write §8912 to expand the jurisdiction of the federal courts. It wrote that section to transfer a category of suits (claims against the United States exceeding $10,000) from one federal court (the Court of Federal Claims) to others (the federal district courts).

In sum, given *Clearfield Trust*, *supra*, and its progeny*,* there is every reason to believe that federal common law governs disputes concerning the agency/carrier contract. And that is so even though "it would have been easy enough for Congress to say" that federal common law should govern these claims. See *ante*, at 15. After all, no such express statement of congressional intent was present in *Clearfield Trust* itself, or in any of the cases relying on *Clearfield Trust* for the authority to apply federal common law to interpret Government contracts. See, *e.g.*, cases cited *supra*, at 6–7; see also *Clearfield Trust*, *supra*,

at 367 ("In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards"). Accordingly, I would apply federal common law to resolve the petitioner's contract claim. And, as explained above, when the "governing rule of law" on which a claim is based is federal common law, then the federal courts have jurisdiction over that claim under §1331.

C

The Court adds that, in spite of the pervasively federal character of this dispute, state law should govern it because the petitioner has not demonstrated a "'significant conflict . . . between an identifiable federal policy or interest and the operation of state law.'" *Ante*, at 12. But as I have explained, see *supra*, at 8–9, the Federal Government has two such interests: (1) the uniform operation of a federal employee health insurance program, and (2) obtaining reimbursement under a uniform set of legal rules. These interests are undermined if the amount a federal employee has to reimburse the FEHBA United States Treasury fund in cases like this one varies from State to State in accordance with state contract law. We have in the past recognized that this sort of interest in uniformity is sufficient to warrant application of federal common law. See, *e.g.*, *Boyle*, 487 U. S., at 508 ("[W]here the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules"); *Kimbell Foods*, 440 U. S., at 728 ("Undoubtedly, federal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules"); *Clearfield Trust*, *supra*, at 367 (applying federal common law because "application of state law . . . would subject the rights and duties of the United States to exceptional uncertainty" and "would lead to great diversity in results by making identical transactions subject to the vagaries of

the laws of the several states," and therefore "[t]he desirability of a uniform rule is plain").

But even if the Court is correct that "'[t]he prudent course'" is "'to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation,'" *ante*, at 11 (quoting *Kimbell Foods*, *supra*, at 740), there would still be federal jurisdiction over this case. That is because, as *Clearfield Trust*, *Kimbell Foods*, and other cases make clear, the decision to apply state law "as the *federal rule of decision*" is *itself* a matter of federal common law. See, *e.g.*, *Kimbell Foods*, *supra*, at 728, n. 21 ("'Whether state law is to be incorporated *as a matter of federal common law* . . . involves the . . . problem of the relationship of a particular issue to a going federal program'" (emphasis added)); *Clearfield Trust*, *supra*, at 367 ("In our choice of the *applicable federal rule* we have occasionally selected state law" (emphasis added)); see also R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 700 (5th ed. 2003) ("[T]he current approach, as reflected in [*Kimbell Foods*, *supra*], suggests that . . . while under *Clearfield* federal common law governs, in general it will incorporate state law as the rule of decision"); C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4518, at 572–573 ("In recent years, the Supreme Court has put increasing emphasis on the notion that *when determining what should be the content of federal common law, the law of the forum state should be adopted absent some good reason to displace it*" (emphasis added; citing *Kimbell Foods*, *supra*, and *Clearfield Trust*, *supra*)).

On this view, the *Clearfield Trust* inquiry involves two questions: (1) whether federal common law governs the plaintiff's claim; (2) if so, whether, *as a matter of federal common law*, the Court should adopt state law as the proper "'*federal* rule of decision,'" *ante*, at 11 (emphasis added). See, *e.g.*, *Kimbell Foods*, *supra*, at 727 (deciding

that "[f]ederal law therefore controls" the dispute but concluding that state law gives "content to this federal rule"); *United States* v. *Little Lake Misere Land Co.*, 412 U. S., at 593–594 (The "first step of the *Clearfield* analysis" is to decide whether "'the courts of the United States may formulate a rule of decision,'" and the "next step in our analysis is to determine whether" the federal rule of decision should "'borro[w]' state law"); see also Friendly, In Praise of *Erie*—and of the New Federal Common Law, 39 N. Y. U. L. Rev. 383, 410 (1964) ("*Clearfield* decided not one issue but two. The first . . . is that the right of the United States to recover for conversion of a Government check is a federal right, so that the courts of the United States may formulate a rule of decision. The second . . . is whether, having this opportunity, the federal courts should adopt a uniform nation-wide rule or should follow state law" (footnote omitted)). Therefore, even if the Court is correct that state law applies to claims involving the interpretation of some provisions of this contract, the decision whether and when to apply state law should be made by the federal courts under federal common law. Accordingly, for jurisdictional purposes those claims must still arise under federal law, for federal common law determines the rule of decision.

Finally, the footnote in *Boyle* cited by the Court did not purport to overrule *Clearfield Trust* on this point. See *Boyle*, *supra*, at 507, n. 3 ("If the distinction between displacement of state law and displacement of federal law's incorporation of state law ever makes a practical difference, it at least does not do so in the present case").

With respect, I dissent.