FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| LUCAS GONCALVES, a minor, by and through his Guardian Ad Litem, Tony Goncalves, *Plaintiff-Appellee,* <br><br> v. <br><br> RADY CHILDREN'S HOSPITAL SAN DIEGO; DOES, 1 through 30, Inclusive, *Defendants,* <br><br> and <br><br> BLUE CROSS & BLUE SHIELD OF MASSACHUSETTS; ANTHEM BLUE CROSS BLUE SHIELD OF NEW HAMPSHIRE; BLUE CROSS OF CALIFORNIA, *Movants-Appellants.* | No. 15-55010 <br><br> D.C. No. 3:14-cv-01774-GPC-BGS <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted November 7, 2016
Pasadena, California

Filed August 2, 2017

Before:  Kim McLane Wardlaw and Jay S. Bybee, Circuit
Judges, and Robert Holmes Bell,* Senior District Judge.

Opinion by Judge Bell;
Dissent by Judge Wardlaw

## SUMMARY**

**Federal Court Jurisdiction**

The panel reversed the district court's order remanding to
state court an action that had been removed to federal court
under the federal officer removal statute.

Insurance companies asserted a lien against the plaintiff's
putative future settlement proceeds in an ongoing California
state court medical negligence action.  The plaintiff moved to
expunge the lien, which was asserted pursuant to a
subrogation clause in a Federal Employee Health Benefit Act
health insurance plan that the insurance companies
administered.

The panel held that the insurance companies properly
removed the action to federal court under the federal officer

---

* The Honorable Robert Holmes Bell, Senior United States District
Judge for the Western District of Michigan, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

removal statute, 28 U.S.C. § 1442(a)(1).   The panel concluded that the insurance companies were a "person" within the meaning of the statute.  Agreeing with the Eighth Circuit, the panel held that the insurance companies' actions seeking subrogation from the plaintiff by pursuing a lien were "actions under" a federal officer because the insurance companies administered the FEHBA health insurance plan on behalf of the Office of Personnel Management.   The insurance companies' actions were causally connected to the dispute over the validity of the lien.   In addition, the insurance companies had a colorable federal defense to the plaintiff's motion to expunge their lien—the defense that California law is preempted by FEHBA's express preemption provision.   Finally, the insurance companies' motion to expunge the lien was a "civil action" within the meaning of the statute.

The panel held that the probate exception to federal jurisdiction did not apply.  Agreeing with other circuits, the panel held that following *Marshall v. Marshall*, 547 U.S. 293 (2006), the probate exception does not apply unless a federal court is endeavoring to probate or annul a will, administer a decedent's estate, or assume in rem jurisdiction over property that is in the custody of a probate court.

The panel held that the prior exclusive jurisdiction doctrine, prohibiting federal and state courts from concurrently exercising jurisdiction over the same res, also did not apply.

Dissenting, Judge Wardlaw wrote that she would affirm the district court's remand order on the ground that the prior exclusive jurisdiction doctrine barred the exercise of federal jurisdiction.   She wrote that both the state and the federal

actions were at least quasi in rem because the plaintiff's settlement funds formed the basis of both actions.

## COUNSEL

Anthony F. Shelley (argued) and Dawn E. Murphy-Johnson, Miller & Chevalier Chartered, Washington, D.C., for Movants-Appellants.

Victoria E. Fuller (argued) and David Niddrie, Niddrie Addams Fuller LLP, San Diego, California; Amy R. Martel and Cynthia R. Chihak, Cynthia Chihak & Associates, San Diego, California; for Plaintiff-Appellee.

Steven M. Bronson, The Bronson Firm APC, San Diego, California; David M. Arbogast, Arbogast Law, Playa Del Rey, California; for Amicus Curiae Consumer Attorneys of California.

## OPINION

BELL, Senior District Judge:

Blue Cross Blue Shield of Massachusetts, Anthem Blue Cross Blue Shield of New Hampshire, and Blue Cross of California (collectively, "the Blues") asserted a lien against Lucas Goncalves's putative future settlement proceeds in an ongoing medical negligence action in California Superior Court to satisfy a subrogation clause in a Federal Employee Health Benefit Act ("FEHBA") health insurance plan that the Blues administer. When Goncalves asked the Superior Court to expunge the lien, the Blues removed the action to federal

court under the federal officer removal statute.  *See* 28 U.S.C. § 1442(a)(1).    The district court held that the probate exception precluded federal court jurisdiction and remanded the action back to state court.

The sole issue on appeal is whether Goncalves's motion to expunge the Blues' subrogation lien is properly in state or federal court.  We have jurisdiction to review the remand order under 28 U.S.C. § 1447(d), *see Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 727 n.1 (9th Cir. 2015), and, holding that the action was properly in federal court, we reverse.

I

Shortly after he was born in October 2007, Lucas Goncalves was transferred to Rady Children's Hospital of San Diego.  While receiving treatment at Rady Children's Hospital, Goncalves suffered internal injuries from alleged medical negligence.

Goncalves was covered by his father's FEHBA health insurance plan administered by the Blues on behalf of the U.S. Office of Personnel Management ("OPM").  Pursuant to the plan's coverage, the Blues paid $459,483.57 for Goncalves's medical treatment in connection with his alleged negligently afflicted injuries from Rady Children's Hospital. The plan has a subrogation clause,[1] allowing the Blues to recover from Goncalves any monies he receives to reimburse

---

[1] We refer to "the plan" even when we mean portions of the contract between OPM and the Blues because the contract is incorporated by reference in the plan.

the Blues for any benefits paid under the plan.  In relevant part, the plan states:

> (a) The [Blues'] subrogation rights, procedures and policies, including recovery rights, shall be in accordance with the provisions of the agreed upon brochure text . . . . [The Blues], in [their] discretion, shall have the right to file suit in federal court to enforce those rights.

> . . . .

> (c) . . . The obligation of the [Blues] to recover amounts through subrogation is limited to making a reasonable effort to seek recovery of amounts to which it is entitled to recover in cases which are brought to [their] attention. . . .

> (d) The [Blues] may also recover directly from [Goncalves] all amounts received by [Goncalves] by suit, settlement, or otherwise from any third party or its insurer . . . for benefits which have been paid under this contract.

> (e) [Goncalves] shall take such action, furnish such information and assistance, and execute such papers as the [Blues] or [their] representatives believe[] are necessary to facilitate enforcement of [their] rights, and shall take no action which would prejudice the interests of the [Blues] to subrogation.

(f) . . . [A]ll Participating Plans shall subrogate under a single, nation-wide policy to ensure equitable and consistent treatment for all Members under the contract.

In February 2011, Goncalves, through a guardien ad litem, filed a state-court action alleging medical malpractice against Rady Children's Hospital and other defendants. In November 2013, the Blues placed a lien of $459,483.57 on any funds Goncalves receives from the suit to recover earlier benefits paid by the Blues under the plan. In April 2014, the California Superior Court approved a settlement between Goncalves and the non-Rady Children's Hospital defendants, leaving Rady Children's Hospital as the sole defendant. Sometime in June 2014, Goncalves and Rady Children's Hospital entered into a settlement agreement; because Goncalves is a minor, the California Probate Code requires the Superior Court's approval of any settlement. *See*, *e.g.*, Cal. Prob. Code §§ 3500(b), 3600; *Schultz v. Harney*, 33 Cal. Rptr. 2d 276, 278 (Ct. App. 1994).

In July 2014, Goncalves filed a motion in state court to expunge the Blues' lien on the ground that the Blues' "claims of lien are subject to the anti-subrogation provision . . . and are therefore unenforceable" because "FEBHA [sic] does not preempt state anti-subrogation laws." The Blues removed this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), to the U.S. District Court for the Southern District of California. Goncalves asked the district court to remand the case to state court on, *inter alia*, two grounds: (1) the Blues could not remove the case under § 1442(a)(1) and (2), even if removal was otherwise proper, the probate exception barred federal jurisdiction. The district court held that the Blues had acted pursuant to a federal

officer's direction and could remove the case pursuant to § 1442(a)(1). The district court, however, agreed with Goncalves that any exercise of federal jurisdiction would interfere with the probate proceedings in California. The district court remanded the case back to state court.

The Blues filed this appeal, arguing that the district court erred because the probate exception did not bar federal jurisdiction. In response, Goncalves continues to argue that the probate exception bars federal jurisdiction, but argues alternatively that even if it does not, the action was not properly removed under § 1442(a)(1). We ordered supplemental briefing as to whether the prior exclusive jurisdiction doctrine barred federal court jurisdiction; the Blues contend that it does not, and Goncalves contends that it does.

## II

We address first whether the Blues properly removed the action to federal court under 28 U.S.C. § 1442(a)(1). We then address whether either the probate exception or the prior exclusive jurisdiction doctrine bars the exercise of federal jurisdiction.

A. *The Action Is Removable Under the Federal Officer Removal Statute*

The federal officer removal statute provides, in relevant part:

> (a) A civil action . . . that is commenced in a State court and that is against or directed to [the following] may be removed by them to

the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

28 U.S.C. § 1442 (emphasis added).  The statute defines a "civil action" to "include any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order . . . is sought or issued." *Id.* § 1442(d)(1).

The purpose of the federal officer removal statute is "to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his duties." *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981).  The right of removal is "absolute for conduct performed under color of federal office," and the "policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'"  *Id.* at 242 (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).

An entity seeking removal under § 1442(a)(1) bears the burden of showing   "that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'"  *Durham v. Lockheed Martin Corp.*, 445 F.3d

1247, 1251 (9th Cir. 2006) (quoting *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999)).  We address each of these three prongs in turn, followed by another consideration raised by the rare procedural posture of this action.  Throughout our analysis, we pay heed to our duty to "interpret Section 1442 broadly in favor of removal."  *Id.* at 1252.

1.  "Person" under § 1442(a)(1)

The Blues and Goncalves do not dispute that the Blues are a "person" within the meaning of § 1442(a)(1).  Nonetheless, we must assure ourselves of our own jurisdiction.  The courts of appeals have uniformly held that corporations are "person[s]" under § 1442(a)(1).  *See In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 467–68 (3d Cir. 2015) (holding that § 1442(a)(1)'s use of the term "person" includes corporations); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (same); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135–36 (2d Cir. 2008) (same).  We agree and, therefore, the Blues have satisfied the first requirement for removal under § 1442(a)(1).  *See* 1 U.S.C. § 1 (defining "person" to include, unless the context indicates otherwise, "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *see also Watson v. Phillip Morris Cos.*, 551 U.S. 142, 152–54, 157 (2007) (using the term "private person" and "company" interchangeably in the context of § 1442(a)(1), but holding that the defendant-company could not remove the action); *Leite v. Crane Co.*, 749 F.3d 1117, 1122 n.4, 1124 (9th Cir. 2014) (citing *Watson*, 551 U.S. at 152–53; and *Isaacson*, 517 F.3d at 135–36); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 n.3 (8th Cir. 2012) (citing *Watson*, 551 U.S. at 152–53).

2.  Causal nexus to actions performed under federal officers

The Blues must also show (1) that their actions seeking subrogation from Goncalves by pursuing a lien are "actions under" a federal officer and (2) that those actions are causally connected to the dispute over the validity of the lien. *See Durham*, 445 F.3d at 1251. The "actions" for purposes of this case are the Blues' choice to pursue a subrogation claim against Goncalves and their placing a lien on the potential settlement proceeds in state court.

We will start with the second prong first because the "hurdle erected by [the causal-connection] requirement is quite low." *Isaacson*, 517 F.3d at 137; *see also Maryland v. Soper*, 270 U.S. 9, 33 (1926) ("[T]he statute does not require that the prosecution must be for the very acts which the officer admits to have been done by him under federal authority. It is enough that his acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false, of the state prosecution."). The Blues need show only that the challenged acts "occurred *because of* what they were asked to do by the Government." *Isaacson*, 517 F.3d at 137. Here, OPM asked the Blues to administer the plan and to make "reasonable efforts" to pursue known subrogation claims. This meets the low bar that the causal-connection prong requires. The "very act" that forms the basis for challenging the lien—seeking subrogation—"is an act that [the Blues] contend[] [they] performed under the direction of [federal officers]." *Leite*, 749 F.3d at 1124. Indeed, in an analogous case involving a challenge to a subrogation claim, the Eighth Circuit held that this requirement was "unquestionably" met. *See Jacks*, 701 F.3d at 1230 n.3.

The only real question for this prong is whether, when seeking subrogation, the Blues "acted under" a federal officer.  Although the federal officer removal statute is not limitless, "[t]he words 'acting under' are broad," and the Supreme Court "has made clear that the statute must be 'liberally construed.'"  *Watson*, 551 U.S. at 147 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)).  For a private entity to be "acting under" a federal officer, the private entity must be involved in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152.  The "relationship typically involves 'subjection, guidance, or control,'" but it must go beyond simply complying with the law, even if the laws are "highly detailed" and thus leave the entity "highly regulated." *Id.* at 151–53 (citation omitted).  Thus, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[] officers fulfill other basic governmental tasks." *Id.* at 153.

Goncalves argues that, in order for a private contractor to qualify for federal removal under § 1442(a)(1), the contractor must have an "unusually close" relationship to the federal government.  *See id.* (noting that lower courts have held that government contractors fall within the terms of the federal officer removal statute when the relationship is "an unusually close one involving detailed regulation, monitoring, and supervision" (citing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998))).  But this statement in *Watson* appears to be descriptive—an attempt to define what the lower courts were doing—not a command to the lower courts to follow a certain test.  *But see Jacks*, 701 F.3d at 1231 (applying the test stated in *Watson* without analyzing whether it was obligated to do so).  We need not decide whether *Watson* requires the "unusually close" relationship

test for governmental contractors because we hold that, even assuming this test applies, the Blues "acted under" a federal officer in pursuing subrogation. *Cf. In re Nat'l Sec. Agency Telecomms. Records Litig.*, 483 F. Supp. 2d 934, 944 (N.D. Cal. 2007) (declining to use the standard).

In order to determine whether the Blues "acted under" a federal officer in filing a subrogation lien, we need to understand how the Blues' FEHBA plan operates and their association with the relevant federal officer, OPM.   In FEHBA, Congress "establishe[d] a comprehensive program of health insurance for federal employees." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 682 (2006).   Congress envisioned the creation of a system whereby "OPM is 'responsible for the overall administration of the program while sharing the day-to-day operating responsibility with the employing agencies and the insurance carriers.'" *Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*, 481 F.3d 265, 271 (5th Cir. 2007) (quoting H.R. Rep. No. 86-957, at 2 (1959)).   FEHBA "authorized [OPM] to contract with private carriers for federal employees' health insurance" and gave OPM "broad administrative and rulemaking authority over the program." *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190, 1194–95 (2017) (citing 5 U.S.C. §§ 8901–13).   FEHBA further states that OPM's contracts with carriers "shall contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable." *McVeigh*, 547 U.S. at 684 (alteration in original) (quoting 5 U.S.C. § 8902(a)).   "OPM has direct and extensive control over these benefits contracts under the FEHBA." *Jacks*, 701 F.3d at 1233.

The government pays about seventy-five percent of the premiums, and the enrollee pays the remainder. *See* 5 U.S.C. § 8906(b). These premiums are all deposited into a special fund in the U.S. Treasury from which the carriers withdraw money to pay benefits. *See id.* § 8909(a); *McVeigh*, 547 U.S. at 703 (Breyer, J., dissenting). But OPM, not the carrier, owns the funds. At the end of the year, OPM decides how to use any surplus in the fund. *McVeigh*, 547 U.S. at 703 (Breyer, J., dissenting). "The carrier is not at risk. Rather, it earns a profit, not from any difference between plan premiums and the cost of benefits, but from a negotiated service charge that the federal agency pays directly." *Id.* A carrier is not acting as an insurer so much as it is acting as a claims processor, serving as the government's agent while the government takes the place of the typical health insurer in hedging bets. "The private carrier's only role in this scheme is to administer the health benefits plan for the federal agency in exchange for a fixed service charge." *Id.*

In fact, when a dispute arises between the carrier and an enrollee over the extent of coverage, it is OPM, not the carrier, that resolves the issue. *See* 5 C.F.R. § 890.105(a). And if an enrollee's coverage is wrongfully denied, the enrollee can bring a suit against both OPM and the Blues. *See, e.g.*, *Skoller v. BlueCross-Blue Shield of Greater N.Y.*, 584 F. Supp. 288, 289 (S.D.N.Y. 1984).

Of specific importance to this case, the contracts that OPM negotiates with private carriers, such as the one here, provide for both reimbursement and subrogation, which we will collectively refer to as "subrogation." *Nevils*, 137 S. Ct. at 1194. In general, subrogation means that "if another person causes an employee to suffer an injury, and the Plan pays benefits for that injury, the employee must agree that the

Plan is entitled to be reimbursed for its benefit payments." *Bell v. Blue Cross & Blue Shield*, 823 F.3d 1198, 1200 (8th Cir. 2016), *cert. denied*, 2017 WL 1427587 (U.S. Apr. 24, 2017). Subrogation has a "long history of federal involvement." *Nevils*, 137 S. Ct. at 1198 (citation omitted). Indeed, "strong and 'distinctly federal interests are involved.'" *Id.* (quoting *McVeigh*, 547 U.S. at 696). In 2014, for instance, FEHBA carriers received roughly $126 million in subrogation recoveries, which "translate to premium cost savings for the federal government and [FEHBA] enrollees" because the recoveries go directly to the special U.S. Treasury fund. *Id.* (alteration in original) (citation omitted); *see also Bell*, 823 F.3d at 1202 ("The scope of a federal employee's reimbursement obligations has a significant impact on the federal treasury and on premiums or benefits for other employees."). In light of the importance of subrogation recoveries, OPM has "obligated the carrier[s] to make 'a reasonable effort' to" pursue subrogation claims. *McVeigh*, 547 U.S. at 683 (citation omitted). Indeed, OPM has evidenced a special interest in ensuring that carriers pursue subrogation claims. In a letter to carriers, after reiterating that the carriers "are required to seek reimbursement and/or subrogation recoveries in accordance with the contract," OPM explains that it construes federal law to mean that FEHBA "preempts state laws prohibiting or limiting subrogation and reimbursement. As a result, FEHB Program carriers are entitled to receive these recoveries regardless of state law." Not only does OPM receive the proceeds of subrogation claims, but it also advises carriers on how to avoid legal obstacles in pursuit of them.

Looking at FEHBA as a whole, it is clear that by pursuing subrogation claims, the Blues go well "beyond simple compliance with the law and help[] officers fulfill other basic

governmental tasks." *Watson*, 551 U.S. at 153. OPM needs someone to make reasonable efforts to pursue subrogation claims and decide when filing suit in federal court is a wise decision—and the government has delegated that responsibility to the carriers to act "on the Government agency's behalf." *Id.* at 156. In light of the interconnectedness between OPM and the Blues, the Blues' obligation to pursue subrogation claims, and the vital federal interest in the pursuit of subrogation claims, we hold that the Blues "act under" a federal officer when they pursue subrogation claims.

Our holding accords with the only other circuit court to address whether a FEHBA program carrier "acts under" a federal officer for purposes of § 1442(a)(1) when pursuing a subrogation claim. *Jacks*, 701 F.3d at 1234. In holding that the carrier and OPM were "unusually close," the Eighth Circuit emphasized that the carriers have been "delegated particular authority by OPM" and are "subject to OPM oversight, uniquely operate[] with the United States Treasury, submit[] to OPM's regulatory requirements, and ultimately answer[] to federal officers." *Id.* Moreover, the court noted that if OPM is unsatisfied with a carrier, it can, "at all times," "withdraw approval of that carrier or terminate its contract." *Id.* (citing 5 C.F.R. § 890.204). Therefore, the Eighth Circuit, using reasoning analogous to our own, held that the carrier was "acting under" a federal officer when pursuing a subrogation claim.

Goncalves makes two arguments against finding that the Blues "acted under" a federal officer when pursuing subrogation. First, citing *Van Horn v. Arkansas Blue Cross & Blue Shield*, 629 F. Supp. 2d 905 (E.D. Ark. 2007), Goncalves argues that the fact that the Blues have "discretion

. . . to file suit in federal court in order to enforce [subrogation] rights" precludes us from holding that the Blues "act under" a federal officer when they pursue subrogation claims.  Indeed, in *Van Horn* the district court held that the carrier did not "act under" a federal officer when pursuing a subrogation claim because the plan stated that the carrier, "*in its discretion*, shall have the right to file suit in federal court in order to enforce [its subrogation] rights."  *Id.* at 914–15.  Goncalves points out that the plan here uses the exact same language as the plan in *Van Horn*:  "[The Blues], in [their] discretion, shall have the right to file suit in federal court in order to enforce those rights."  So because the Blues have discretion to act in this one corner of the plan, when they do so they cannot be "acting under" a federal officer.

The Eighth Circuit explicitly rejected *Van Horn*, and we do as well.  *Jacks*, 701 F.3d at 1233 ("That the Plan allows the carrier the discretion to pursue subrogation does not foreclose the application of the federal officer removal statute.").  The Eleventh Circuit, in an unpublished opinion, has rejected a similar argument.  *See Anesthesiology Assocs. of Tallahassee, FL, P.A. v. Blue Cross Blue Shield of Fla., Inc.*, No. 03-15664, 2005 WL 6717869, at *2 (11th Cir. Mar. 18, 2005) (per curiam) (holding that a FEHBA carrier "acted under" a federal officer even when exercising "the *option* of reimbursing the participant, rather than the provider" (emphasis added)).  Nowhere have we found support for the proposition that only non-discretionary choices qualify for removal under § 1442(a)(1).  Simply put, just because the Blues are vested with discretion does not mean that they are not "involve[d] in an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 152.  The "task" here is the administration of a health insurance program for federal employees, and seeking

subrogation assists in that effort regardless of whether the Blues have some discretion in completing that task.

But even if the exercise of discretion were fatal to a finding of "acting under," it is not clear that the Blues have done anything in *this* case that can be characterized as discretionary. As we have discussed, the Blues are obligated to make a "reasonable effort" to pursue subrogation claims. Discretion comes into play only when the Blues decide whether to assert their subrogation rights "in federal court." The relevant action here for purposes of deciding the "acting under" question is not the Blues' choice to remove the case to federal court, which might well fall under the discretionary clause, but rather their filing of a lien in state court. When they filed the lien, the Blues were simply complying with their obligation to OPM to use "reasonable efforts" to pursue subrogation claims. The discretionary clause of the plan does not even apply to this case.

Goncalves also argues that OPM's oversight and regulatory requirements do not bestow federal officer status onto the Blues because simple compliance with the law is not sufficient to place a private party within the scope of "acting under." *See Watson*, 551 U.S. at 152–53 (holding that "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law"). The requirements and contractual obligations bestowed on the Blues by OPM are, however, a far cry from the laws and regulations that the Supreme Court was referring to in *Watson* when it held that being a federally regulated entity did not mean that the entity "acts under" federal officers. *Watson* gave some examples of the activities that are more properly characterized as complying with the law

than as "acting under" a federal officer by "helping" or "assisting":

> Taxpayers who fill out complex federal tax forms, airline passengers who obey federal regulations prohibiting smoking, for that matter well-behaved federal prisoners, all "help" or "assist" federal law enforcement authorities in some sense of those words. But that is not the sense of "help" or "assist" that can bring a private action within the scope of this statute.

*Id.* at 152.  We too would describe the actions of these taxpayers, passengers, and prisoners as "*compliance* with the law (or *acquiescence* to an order), not as 'acting under' a federal official who is giving an order or enforcing the law." *Id.*  So to the extent that the Blues treat the sexes equally in employment, *see* 42 U.S.C. § 2000e-2, grant coverage irrespective of preexisting conditions, *see* 42 U.S.C. § 300gg-3, and follow every other generally applicable federal law, rule, and regulation, they are not "acting under" a federal officer.  But that is not what the Blues are doing when they contract with OPM to be subject to extensive oversight in accordance with FEHBA and to use "reasonable efforts" to pursue subrogation claims on behalf of OPM.  *See Jacks*, 701 F.3d at 1234 (rejecting arguments similar to those raised by Goncalves); *see also Issacson*, 517 F.3d at 137 (distinguishing between entities that "contracted with the Government" and entities that were "simply regulated by federal law").  The relationship between OPM and the Blues is well beyond "the usual regulator/regulated relationship." *Watson*, 551 U.S. at 157.  *Watson* does not counsel against removal here.

Although at first glance it may appear that the Blues are operating as private insurance companies divorced from federal officers, a review of OPM's oversight and directives, FEHBA's comprehensive federal program, and the Blues' role in it belies that contention.  We join the Eighth Circuit in holding that FEHBA carriers are "acting under" federal officers for the purposes of 28 U.S.C. § 1442(a)(1) when pursuing subrogation claims.[2]

### 3.  Colorable federal defense

The Blues argue that they have several colorable federal defenses to Goncalves's motion to expunge their lien: (1) California law is preempted by FEHBA's express preemption provision under 5 U.S.C. § 8902(m)(1); (2) sovereign immunity; and (3) Goncalves's state-law allegations are displaced by federal common law.  While the Blues and Goncalves vigorously argue over each of these three defenses, we need find but one colorable defense to satisfy this prong.

Recent Supreme Court precedent has made our task easy. This Term, in *Nevils*, 137 S. Ct. 1190, the Supreme Court held that § 8902(m)(1) preempts state anti-subrogation laws by virtue of the fact that the "carrier's very provision of benefits triggers the right to payment," and all that is required

---

[2] We also note that a number of federal courts have determined that Medicare Part B carriers contracting with the U.S. Department of Health and Human Services "act under" a federal officer.  *See*, *e.g.*, *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1004–05 (8th Cir. 1998); *Bodimetric Health Servs., Inc. v. Aetna Life & Cas.*, 903 F.2d 480, 487–88 (7th Cir. 1990); *Grp. Health Inc. v. Blue Cross Ass'n*, 793 F.2d 491, 493 (2d Cir. 1986); *Peterson v. Blue Cross/Blue Shield*, 508 F.2d 55, 57–58 (5th Cir. 1975).

for preemption is for the action to "relate to" that right to repayment, which is met in the subrogation-claim context. *Id.* at 1197–98.   In light of *Nevils*, we have little trouble concluding that the Blues' assertion that § 8902(m)(1) preempts any state law supporting Goncalves's motion to expunge the lien is a colorable federal defense.

   4.   A "civil action" that is "against or directed to" the Blues

Goncalves argues that removal was improper because there is no "civil action . . . commenced in a State court . . . against or directed to" the Blues.  28 U.S.C. § 1442(a).  The civil action, in Goncalves's view, is the medical negligence action he filed against Rady Children's Hospital, which he argues was not "against" or "directed to" the Blues—they were not defendants or parties nor did they seek to intervene or were they going to incur any obligations as a result of the litigation.  If that were the end of the story, Goncalves might well be right that the Blues could not remove the action.**[3]**  But the Blues then placed a lien on the proceeds of the action, and Goncalves moved to expunge the lien on the ground that it violated California's anti-subrogation law.  *See* Cal. Civ. Code § 3333.1.  We hold that the Blues' motion to expunge the lien is a "civil action . . . commenced in a State court . . . against or directed to" the Blues.

---

**[3]** We do not mean to foreclose the possibility that the medical negligence action against Rady Children's Hospital (and other defendants) could have been "directed to" the Blues within the meaning of the statute. Rather, we need not address the question because it was the motion to quash the lien, not the alleged medical negligence, that formed the basis for the Blues' removal.

The statutory history of § 1442 is instructive. For decades following the federal officer removal statute's codification at 28 U.S.C. § 1442, it has provided that a "civil action"—a term which was previously undefined—"commenced . . . *against*" any officer of the United States, or person acting thereunder, "*sued* in an official or individual capacity *for* any act under color of" federal office may remove the action to federal court. 28 U.S.C. § 1442 (2006) (emphases added). But in 2011, Congress passed the Removal Clarification Act to amend § 1442 because Congress felt that the courts were construing the statute too narrowly. Pub. L. No. 112-51, 125 Stat. 545; *see* H.R. Rep. No. 112-17(I) (2011); *In re Commonwealth's Motion*, 790 F.3d at 467 (noting that the amendments "intended to broaden the universe of acts that enable Federal officers to remove to Federal court" (citation omitted)).**[4]** Congress expanded the language to allow removal of a "civil action . . . that is against *or directed to*" a federal officer "for *or related to* any act under color of [federal] office," 28 U.S.C. § 1442(a) (emphases added)—removing altogether the requirement that the officer be "sued." Congress also provided a definition for the term "civil action" used in § 1442(a) and placed a limitation on the content of the removed proceedings:

> The term[] "civil action" . . . include[s] any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is

---

**[4]** Barely a year later, Congress re-ordered § 1442. *See* National Defense Authorization Act of Fiscal Year 2013, Pub. L. No. 112-239, tit. X, subtit. G, § 1087, 126 Stat. 1632, 1969–70. For simplicity, we will refer to the subsections in the current version.

> sought or issued.  If removal is sought for a
> proceeding described in the previous sentence,
> and there is no other basis for removal, only
> that proceeding may be removed to the district
> court.

*Id.* § 1442(d)(1).

We think the motion to expunge the Blues' lien comes comfortably within the new, expanded statute.  Goncalves's motion to expunge the lien is a proceeding in which "a judicial order . . . is sought." *Id.*  To be sure, Goncalves's motion to expunge the lien is ancillary to the core proceeding for medical negligence, but the statute tells us that does not matter.  *See id.* § 1442(d)(1) ("whether or not ancillary to another proceeding").  And there is no serious argument that the motion to expunge the Blues' lien is not "against or directed to" the Blues.

Goncalves points to court decisions where other circuits have held that a state court summons of a federal officer in a wage garnishment action is not a "civil action" that could be removed to federal court.  *See*, *e.g.*, *Murray v. Murray*, 621 F.2d 103, 106–07 (5th Cir. 1980).  For several reasons, these cases are not persuasive.  First, these decisions were rendered under the prior version of § 1442.  Second, we expressly rejected these cases in *Nationwide Investors v. Miller*, 793 F.2d 1044, 1046 (9th Cir. 1986).  Third, the reasoning of those cases is wrong.  As we explained in *Nationwide Investors*, they barred removal of garnishment cases because the "United States is a mere stakeholder whose substantive obligations [to pay the wages] remain the same" regardless of to whom the United States has to pay or from which court, state or federal, payment is ordered.  *Id.*  Even

if we were otherwise inclined to follow the old garnishment cases such as *Murray*, the Blues are not a "mere stakeholder" in interpleader.  Rather, they either get a lien on behalf of OPM or they do not get a lien, and the lien has real value to OPM.

Finally, we will observe that any other result would make the availability of a federal forum dependent on the manner in which an enrollee chooses to challenge a subrogation lien. If done in an independent action, then the carrier is entitled to remove the action to federal court.  *See Jacks*, 701 F.3d at 1228 (allowing removal of an enrollee's suit against a carrier for violation of anti-subrogation laws in placing a subrogation lien).  But, as Goncalves would have it, if the enrollee challenges the subrogation lien in a forum where the subrogation lien is ancillary to other claims, then the carrier would not be able to avail itself of a federal forum.  We decline to create an incentive for forum shopping, especially in light of OPM's contracted-for desire to have subrogation claims treated "under a single, nation-wide policy to ensure equitable and consistent treatment for all Members under the contract."  *Cf. Nevils*, 137 S. Ct. at 1197 ("Strong and 'distinctly federal interests are involved' in uniform administration of [FEHBA], free from state interference, particularly in regard to coverage, benefits, and payments." (citation omitted)).

B. *State Court Proceedings Do Not Preclude Federal Jurisdiction*

1.  The probate exception

The probate exception to federal jurisdiction reserves probate matters to state probate courts and precludes federal

courts from disposing of property in the custody of a state court. *Marshall v. Marshall*, 547 U.S. 293, 311 (2006). But it does not bar "federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction." *Id.* at 311–12. Federal courts have jurisdiction to entertain suits to determine the "rights of creditors, legatees, heirs, and other claimants against a decedent's estate, 'so long as the federal court does not *interfere with the probate proceedings.*'" *Id.* at 311 (quoting *Markham v. Allen*, 326 U.S. 490, 494 (1946)); *see also Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc.*, 918 F.2d 1065, 1072 (2d Cir. 1990) (holding that a federal court may adjudicate rights to property in an estate so long as it does not interfere with the state court's possession).

Prior to the Supreme Court's decision in *Marshall v. Marshall*, we followed a test from the Second Circuit for determining whether the probate exception precluded jurisdiction. *Moser v. Pollin*, 294 F.3d 335 (2d Cir. 2002). *See In re Marshall*, 392 F.3d 1118, 1132–33 (9th Cir. 2004), *rev'd sub nom. Marshall v. Marshall*, 547 U.S. 293. Under *In re Marshall*'s adoption of *Moser*, we (along with other circuits) used a two-part inquiry to determine whether an action was so "probate related" that we could not exercise jurisdiction:

> The first part of the inquiry focuses on the question whether the matter is purely probate in nature, in that the federal court is being asked directly to probate a will or administer an estate. As the *Moser* court noted "since few practitioners would be so misdirected as to seek, for example, letters testamentary or letters of administration from a federal judge,"

> the answer to this question is almost always "No." The second part of the inquiry focuses on whether the matter is probate related by determining whether, by exercising jurisdiction over the matter, the federal court would: (1) interfere with the probate proceedings; (2) assume general jurisdiction of the probate; or (3) assume control over property in custody of the state court. If the answer to any of these questions is yes, then the probate exception applies.

392 F.3d at 1133 (footnote omitted) (citations omitted).

But in *Marshall*, the Supreme Court explained that our endeavors to classify actions as "interfer[ing] with probate proceedings" led to expansive, and erroneous, applications of the probate exception. 547 U.S. at 311. Indeed, the Court admonished the courts of appeals for applying this "exception of distinctly limited scope" to "a range of matters well beyond probate of a will or administration of a decedent's estate." *Id.* at 310–11. Recognizing that the Court itself was partly to blame for the overly broad application of the probate exception because its previous elucidations were not "model[s] of clear statement," the Court provided a straightforward explanation of the probate exception:

> [T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court.

*Id.* at 311–12.

Based on this clear directive, several courts of appeals have come to a simple conclusion, with which we agree, about the scope of the probate exception: "It is clear after *Marshall* that unless a federal court is endeavoring to (1) probate or annul a will, (2) administer a decedent's estate, or (3) assume *in rem* jurisdiction over property that is in the custody of the probate court, the probate exception does not apply." *Three Keys Ltd. v. SR Util. Holding Co.*, 540 F.3d 220, 227 (3d Cir. 2008); *accord Chevalier v. Estate of Barnhart*, 803 F.3d 789, 801 (6th Cir. 2015); *Lee Graham Shopping Ctr., LLC v. Estate of Kirsch*, 777 F.3d 678, 680–81 (4th Cir. 2015); *Curtis v. Brunsting*, 704 F.3d 406, 409 (5th Cir. 2013); *see also Lefkowitz v. Bank of N.Y.*, 528 F.3d 102, 106–07 (2d Cir. 2007) ("Following *Marshall* we must now hold that so long as a plaintiff is not seeking to have the federal court administer a probate matter or exercise control over a res in the custody of a state court, if jurisdiction otherwise lies, then the federal court may, indeed must, exercise it."). It is not clear that the Supreme Court's test in *Marshall v. Marshall* and our multi-step, multi-factor test in *in re Marshall* are "clearly irreconcilable," *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc), but *Marshall* surely represents a restatement and a refinement of the test we had previously followed. We need not go so far as to announce that *Marshall* overruled the prior test, but we will accept the reformulation adopted by the other circuits as a refinement. *See Lefkowitz*, 528 F.3d at 106 (recognizing that *Moser*'s test was "overly-broad and has now been superseded by *Marshall*'s limitation of the exception").

In sum, the probate exception prevents a federal court from probating a will, administering a decedent's estate, or

disposing of property in the custody of a state probate court. Neither the Blues nor Goncalves contests that neither of the first two exceptions applies here. Even though the Superior Court's authority to supervise Goncalves's settlement derives from the California Probate Code, there is nothing in this case that sounds in probate. There is no will or estate—indeed, there is no decedent. And we do not believe that the probate exception to federal jurisdiction can rest on the ways in which California chooses to organize its code; placing the provisions governing the compromises of a minor's claim in the California Probate Code does not make the proceeding probate. *See Marshall*, 547 U.S. at 314 ("[T]he jurisdiction of the federal courts, 'having existed from the beginning of the Federal government, [can]not be impaired by subsequent state legislation creating courts of probate.'" (citation omitted)); *cf. id.* at 311 (admonishing federal courts for expanding the probate exception "to block federal jurisdiction over a range of matters well beyond probate of a will or administration of a decedent's estate").

The question remaining for us is whether a federal court would need to "dispose of property that is in the custody of a state probate court." *Id.* at 312. But *Marshall* tells us that this aspect of its enunciation of the probate exception is simply "a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." *Id.* at 311. Or in other words, it has little to do with probate; rather, it is an application of the prior exclusive jurisdiction doctrine. *See Chapman v. Deutsche Bank Nat'l Tr. Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011) (using the quotation from *Marshall* to define the prior exclusive jurisdiction doctrine).

Because the prior exclusive jurisdiction doctrine is a mandatory rule applicable not just in matters with a relationship to probate but in all cases, *see id.*, we do not think it does anyone any favors to discuss it within the confines of the probate exception.  Therefore, we will next turn to the prior exclusive jurisdiction doctrine outside the intellectual confines of the probate exception.

2.  The prior exclusive jurisdiction doctrine

The prior exclusive jurisdiction doctrine is a "mandatory jurisdictional limitation" that prohibits federal and state courts from concurrently exercising jurisdiction over the same *res*.  *Chapman*, 651 F.3d at 1043 (quoting *State Eng'r v. S. Fork Band of Te-Maok Tribe of W. Shoshone Indians*, 339 F.3d 804, 810 (9th Cir. 2003)).  The question whether the prior exclusive jurisdiction doctrine applies turns on what, precisely, is at issue in the state and federal court proceedings.  If both courts exercise either *in rem* or *quasi in rem* jurisdiction, then the courts may be simultaneously exercising jurisdiction over the same property, in which case the prior exclusive jurisdiction doctrine applies and the district court is precluded from exercising jurisdiction over the *res*.  *See Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922).  Here, we must first determine whether, in ruling on the validity of the Blues' lien, the district court would exercise *in rem* or *quasi in rem* jurisdiction over a *res*.  And if it would, we must determine whether the California Superior Court has exercised *in rem* or *quasi in rem* jurisdiction over the same *res*.

The prior exclusive jurisdiction doctrine is not restricted to cases where the property has been "actually seized under judicial process before a second suit is instituted.  It applies

as well where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature, where, to give effect to its jurisdiction, the court must control the property." *United States v. Bank of N.Y. & Tr. Co.*, 296 U.S. 463, 477 (1936). But where a judgment is "strictly *in personam* . . . both a state court and a federal court having concurrent jurisdiction may proceed with the litigation." *Penn Gen. Cas. Co. v. Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935). In other words, the federal court "may not 'seize and control the property which is in the possession of the state court.'" *Fischer v. Am. United Life Ins. Co.*, 314 U.S. 549, 554 (1942) (citation omitted). "Short of that, however, the federal court may go." *Id.* at 554–55.

An action is *in rem* when it "determine[s] interests in specific property as against the whole world." *State Eng'r*, 339 F.3d at 811 (quoting In Rem, BLACK'S LAW DICTIONARY (6th ed. 1990)). "Under California law, a suit proceeds *in rem* [only] where property is 'seized and sought to be held for the satisfaction of an asserted charge against property without regard to the title of individual claimants to the property.'" *Hanover Ins. Co. v. Fremont Bank*, 68 F. Supp. 3d 1085, 1109 (N.D. Cal. 2014) (quoting *Lee v. Silva*, 240 P. 1015, 1016 (Cal. 1925)). An action is *quasi in rem* when it is brought "against the defendant[s] personally" but "the [parties'] interest[s] in the property . . . serve[] as the basis of the jurisdiction." *State Eng'r*, 339 F.3d at 811 (alterations in original) (quoting Quasi In Rem, BLACK'S LAW DICTIONARY (6th ed. 1990)).

"On the other hand, where a party initiates an action merely to 'determine the personal rights and obligations of the [parties],' the court asserts *in personam* jurisdiction." *Hanover Ins. Co.*, 68 F. Supp. 3d at 1109 (quoting *Pennoyer*

*v. Neff*, 95 U.S. 714, 727 (1877)); *see also* In Personam, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining an action *in personam* as one "brought against a person" that "can be enforced against all the property of the judgment-debtor").   A federal court "may proceed to judgment in personam, adjudicating rights in the res and leaving the in personam judgment to bind as res judicata the court having jurisdiction of the res." *Jackson v. U.S. Nat'l Bank*, 153 F. Supp 104, 110 (D. Or. 1957).

Although the Blues have removed the proceeding to expunge the lien, they seek the district court's determination of their rights, not enforcement of the lien.  The Blues are seeking "merely to establish . . . a right to share in [the settlement funds]." *Bank of N.Y.*, 296 U.S. at 478.  It is well settled that such actions are properly classified as *in personam*. *See Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939) ("[T]he principle . . . that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other . . . has no application to a case in a federal court based upon diversity of citizenship, wherein the plaintiff seeks merely an adjudication of his right of his interest as a basis of a claim against a fund in the possession of a state court."); *Commonwealth Tr. Co. of Pittsburgh v. Bradford*, 297 U.S. 613, 619 (1936) (holding that a determination of rights to trust funds was not *in rem* because it sought "only to establish rights" rather than to "deal with the property and other distribution").

The gravamen of the complaint is clear: the Blues seek to vindicate their subrogation rights.  They are not asking the district court to take any of the settlement funds from the state court's control.  Nor would the district court's determination

necessarily involve a disturbance of possession or control of the settlement. *Fischer*, 314 U.S. at 554. Since the Blues seek only a determination of their rights, the action in federal court is an *in personam* action, not an action *in rem* or *quasi in rem*. Thus, the doctrine of prior exclusive jurisdiction does not apply. Because the Superior Court's jurisdiction over the minor's compromise is not "so exclusive as to bar an adjudication by the federal court of the rights of a claimant to the res or the quantum of his interest in it," *id.* at 555, the district court improperly remanded the case to the state court.

At the time that the Blues removed the case to federal court, the Superior Court had not exercised *in rem* or *quasi in rem* jurisdiction, either. Instead, the Superior Court was deciding whether to approve the settlement in the first place. *See* Cal. Prob. Code § 3600; *Pearson v. Superior Court*, 136 Cal. Rptr. 3d 455, 457 (Ct. App. 2012) ("An agreement to settle or compromise a claim made by a minor 'is valid only after it has been approved, upon the filing of a petition, by the superior court . . . .'" (alteration in original) (quoting Cal. Prob. Code § 3500(b))). The court had not "taken possession of property," *Sexton v. NDEX W., LLC*, 713 F.3d 533, 536 (9th Cir. 2013), nor did it have "custody," *Marshall*, 547 U.S. at 312, over the potential settlement money. In fact, it had not taken possession, custody, or control of any property. The property was held by Goncalves's attorney in a trust account pending the resolution of this litigation.

Although the Superior Court must issue an order "authorizing and directing" the payment of reasonable expenses, "including reimbursement to a parent, guardian, conservator, costs, and attorney's fees," Cal. Prob. Code § 3601(a), and may order that the money be paid into a special-needs trust, *id.* § 3602, the court did not have custody

of the settlement itself, and there is no apparent reason why it should seize the settlement.  Even if the Superior Court were to obtain *in rem* jurisdiction over an approved settlement agreement through the probate code, that would occur only after the Superior Court approves of the settlement.  *See id.* § 3600 (noting that the chapter applies only after the court approves of the compromise).  Thus, the Superior Court had not exercised *in rem* or *quasi in rem* jurisdiction over the potential proceeds of the yet-to-be-approved settlement.

Goncalves asserts that the removal of the Blues' lien claim made the settlement proceeds the *res* or subject matter of the action and bestowed jurisdiction over the *res* upon the district court.  That is incorrect.  Goncalves cites *Alyeska Pipeline Service Co. v. Vessel Bay Ridge*, 703 F.2d 381, 394 (9th Cir. 1983), but that case is inapposite.  *Alyeska Pipeline* dealt with the enforcement of a lien, not a determination of rights.  In fact, all of the case law that Goncalves relies upon to classify this as an *in rem* proceeding involves lien-enforcement proceedings.[5]

---

[5] Goncalves argues that the Blues removal action seeks the same relief requested in state court—enforcement of their subrogation rights against proceeds from the settlement.  The Blues contend that they are seeking a rights determination from the district court, not enforcement of the lien. The courts have long held that a lien enforcement proceeding is different from a proceeding in which the validity of a lien is determined.  *See, e.g.*, *In re Williams' Estate*, 156 F. 934, 939 (9th Cir. 1907) (distinguishing between proceedings to determine "the validity of the lienholder's contract" and "his remedy to enforce his rights"); *Connolly Dev., Inc. v. Superior Court*, 553 P.2d 637, 650 (Cal. 1976) (distinguishing between a suit to "enforce [a] lien" and a "suit for declaratory relief" as to the validity of the lien); *Mojtahedi v. Vargas*, 176 Cal. Rptr. 3d 313, 316 (Ct. App. 2014) (holding that an "attorney's lien is only enforceable after the attorney adjudicates the value and validity of the lien in a separate action

Goncalves also argues that, at the very least, the state court action is *quasi in rem* because the parties' interests in the property serve as the basis for jurisdiction. *See State Eng'r*, 339 F.3d at 811. But this is also incorrect. It is the state court's supervisory role that forms the basis of its jurisdiction. Part of that supervisory role is to ensure that the settlement funds are disbursed to parties with rights to the funds, but that function is not essential to the exercise of the court's jurisdiction. *Cf. Bank of N.Y.*, 296 U.S. at 477 (noting that "[c]ontrol of the funds was essential to the exercise of the court's jurisdiction to protect the rights of claimants" in *quasi in rem* proceedings).

Practically, the Blues are asking the district court, under the terms of their federally approved contract, to determine rights to a settlement that they claim is contractually theirs. If the district court adjudicates the lien against Goncalves's settlement fund, it will not interfere with the Superior Court's possession of property for the purposes of lien enforcement. We conclude that the prior exclusive jurisdiction doctrine does not bar the district court's determination of the Blues' subrogation rights.

## III

In administering the FEHBA plan by pursuing subrogation against Goncalves, the Blues "acted under" a federal officer for purposes of the federal officer removal statute, and thus the action was properly removed to federal court. *See* 28 U.S.C. § 1442(a)(1). Because neither the

---

against his client"). Based on the district court record, it appears that the Blues are seeking only a determination of the validity of their subrogation rights.

probate exception to federal jurisdiction nor the prior exclusive jurisdiction doctrine precludes federal jurisdiction, the action should not have been remanded back to state court.

**REVERSED and REMANDED.**

---

WARDLAW, Circuit Judge, dissenting:

I respectfully disagree with the majority's holding that a federal court may exercise jurisdiction over Goncalves's motion to expunge the Blues' lien, and I would affirm the district court's order remanding the motion to the California Superior Court. We need not even reach the complicated question whether the action was properly removed under the Federal Officer Removal Statute. Whether or not it was, the "prior exclusive jurisdiction" doctrine bars the exercise of federal jurisdiction here.

## I.

To understand the proceedings in this case—and why they implicate the prior exclusive jurisdiction doctrine—it is necessary to understand the State of California's framework for approving the settlement of a minor's legal claim. I discuss that framework first, and then describe the proceedings in this case in the California and federal courts.

*A.* *California's Requirements for Settling a Minor's Legal Claim.*

To protect the interests of minors, California courts are required to approve the settlement of a minor's legal claim,

as well as the payment of any expenses out of the settlement proceeds. *See* Cal. Civ. Proc. Code § 372; Cal. Prob. Code §§ 3500(b), 3600–05, 3610–13; Cal. Rules of Court 7.950–7.955. After the parties have reached an agreement to settle, a California Superior Court must conduct a "liability analysis" to "determine if [the] settlement is reasonable." *Espericueta v. Shewry*, 164 Cal. App. 4th 615, 627 (2008). If it is, the court must then determine what "reasonable expenses" should be paid out of the settlement proceeds. Cal. Prob. Code § 3601. This includes determining how much money should be paid to parties asserting liens on the settlement funds. *See Goldberg v. Superior Court*, 23 Cal. App. 4th 1378, 1383 (1994). The court has "broad power" to determine which parties should be paid *and* how much they should be paid. *Id.* at 1382. After it has made its determination, the court enters an order "authorizing and directing" disbursement of the funds. Cal. Prob. Code § 3601.

Though that is all a court is required to do during the settlement approval process, it may also take additional steps to administer the funds. For example, a court may order that the settlement funds be deposited in an insured account, *id.* § 3602(c)(1), used to purchase an annuity, *id.*, or delivered to a custodian, *id.* § 3602(c)(2). The court may also order the transfer of the funds into a "special needs trust"—a unique form of trust for disabled minors. *Id.* §§ 3602(d), 3604(a)(1); *see also* 14 B.E. Witkin et al., *Summary of California Law: Wills* § 1072 (10th ed. 2005).

*B.  The Settlement Approval Proceedings in Goncalves's
     Medical Malpractice Case.*

In 2011, Goncalves filed a medical malpractice action in
the Superior Court of California, County of San Diego,
against Rady Children's Hospital and three other defendants.[1]
Register of Actions at 1, *Goncalves v. Rady Children's
Hospital San Diego*, No. 37-2011-00085051-CU-MM-CTL
(Cal. Super. Ct. filed 2011).

In 2014, Goncalves reached settlement agreements with
the three non-Rady Children's Hospital defendants.  *Id.* at
114, 117–19, 121, 124, 137, 142.  The San Diego Superior
Court found the settlements reasonable and approved them.
*Id.* at 121.  Pursuant to its settlement-approval powers, the
court ordered a payment of fees to Goncalves's attorney.
Petition to Approve Compromise of Claim at 7 (Register of
Actions 156), *Goncalves v. Rady Children's Hospital San
Diego*, No. 37-2011-00085051-CU-MM-CTL (Cal. Super. Ct.
filed 2011).  In addition, it ordered that $492,501.69 of the
settlement funds be held in trust by Goncalves's attorney.  *Id.*
Att. 13b(5).  It did so because various nonparties, including
the Blues, had asserted liens on Goncalves's settlement
proceeds (the "Lien Litigation"), and the amounts that would
be paid on the liens had not yet been resolved.  *Id.*

---

[1] Many of the facts in this section come from state-court documents
that were not included in the parties' original excerpts of record.
However, "[i]t is well established that we may take judicial notice of
judicial proceedings in other courts," and the majority should have done
so here.  *See Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir.
2014); *see also* Fed. R. Evid. 201(b)–(d).

In 2015, Goncalves reached an agreement to settle his claim against Rady Children's Hospital for $800,000. Order Approving Compromise of Claim at 2 (Register of Actions 159), *Goncalves v. Rady Children's Hospital San Diego*, No. 37-2011-00085051-CU-MM-CTL (Cal. Super. Ct. filed 2011). The San Diego Superior Court approved the settlement. *Id.* at 4. It then took a number of additional administrative steps. It directed a payment to Goncalves's attorneys for fees and expenses. *Id.* at 2. It ordered that a portion of the funds be placed in a special needs trust, and that another portion be used to purchase an annuity. *Id.* Att. 7c2b; Petition to Approve Compromise of Claim, *supra*, at 9. Further, the court ordered Goncalves's attorney to hold $39,351.82 of the funds "until the resolution of the Lien litigation"; that money was in addition to $420,131.75 still remaining in the trust account. Order Approving Compromise of Claim, *supra*, at 2. Goncalves's attorney agreed to release the funds only if "expressly authorized by th[e] court." Petition to Approve Compromise of Claim, *supra*, at 10. Any funds remaining after the lien payments were made would be "transferred to the special needs trust." *Id.*

After the San Diego Superior Court had disbursed the funds from the first three settlements and directed a portion into the trust account—but before the settlement with Rady Children's Hospital—Goncalves filed a motion with the court requesting that it expunge the lien asserted by the Blues. The court scheduled a hearing on the motion. Minute Order (Register of Actions 140), *Goncalves v. Rady Children's Hospital San Diego*, No. 37-2011-00085051-CU-MM-CTL (Cal. Super. Ct. filed 2011). Before it could determine whether the Blues would be paid on their lien, and to what extent, the Blues removed the motion to federal court.

Goncalves nevertheless proceeded in state court to settle his remaining claim against Rady Children's Hospital and resolve other liens asserted on his settlement proceeds. The San Diego Superior Court also disbursed the additional funds from the final settlement and ordered that some be placed in the trust account. The San Diego Superior Court continues to exercise jurisdiction over the case so that it can issue future orders regarding the Blues' lien and the remaining funds in the trust account. Application for an Order Setting Aside Dismissal (ROA 166), *Goncalves v. Rady Children's Hospital San Diego*, No. 37-2011-00085051-CU-MM-CTL (Cal. Super. Ct. filed 2011); Minute Order (ROA 168), *Goncalves v. Rady Children's Hospital San Diego*, No. 37-2011-00085051-CU-MM-CTL (Cal. Super. Ct. filed 2011).

## II.

The prior exclusive jurisdiction doctrine is a "mandatory" limitation on federal jurisdiction. *Chapman v. Deutsche Bank Nat'l Tr. Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011) (quoting *State Eng'r v. S. Fork Band of Te-Maok Tribe of W. Shoshone Indians*, 339 F.3d 804, 810 (9th Cir. 2003)). A federal court may not exercise control over property that is already under the control of a state court. *Id.* at 1043–44. In other words, it may not hear an *in rem* or *quasi in rem* action involving property that is part of an *in rem* or *quasi in rem* action in state court. *Id.* To determine whether the prior exclusive jurisdiction doctrine applies, we must determine the nature of the relevant state and federal actions. If they are both *in rem* or *quasi in rem*, and if the state court was the first to assert jurisdiction over the property, then the federal court may not proceed. *Id.*

What matters for our inquiry is whether the state and federal actions are either *in rem* or *quasi in rem*, rather than *in personam*. We need not make the narrower distinction between *in rem* and *quasi in rem*. As the Supreme Court has explained, an action is at least *quasi in rem* where, "to give effect to its jurisdiction, [a] court must control the property." *United States v. Bank of N.Y. & Tr. Co.*, 296 U.S. 463, 477 (1936). Put another way, an action is at least *quasi in rem* where "it is the [parties'] interest[s] in the property that serve[] as the basis of the jurisdiction." *State Eng'r*, 339 F.3d at 811 (alterations in original) (quoting *Black's Law Dictionary* 1245 (6th ed. 1990)). The relief sought in a *quasi in rem* or *in rem* action is possession of specific property. *See Bank of N.Y.*, 296 U.S. at 478.

If an action is not *in rem* or *quasi in rem*, then it is *in personam*. An *in personam* action is one brought against a defendant personally that does not require the court to control property. *See id.* at 478. The relief sought in an *in personam* action is a judgment that "can be enforced against *all the property* of the judgment-debtor." *Action*, *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

We do not rely on "formalistic distinction[s]" when labeling an action *in rem*, *quasi in rem*, or *in personam*. *State Eng'r*, 339 F.3d at 810. Rather, we "look behind the form of the action" to determine the "nature" of the case. *Id.* at 810–11 (internal quotation marks omitted). For example, even if an action appears on the face of the complaint to be *in personam*, we may nevertheless find that it is *in rem* or *quasi in rem*. *Id.*

*State Engineer* provides an example of the proper analysis. That case involved contempt proceedings that had

been removed to federal court. *Id.* at 808. Nevada initiated the proceedings against the defendant for allegedly failing to comply with a court decree allocating water rights in the Humboldt River. *Id.* A contempt action is "brought only 'against the defendant[s] personally'" and is typically styled as an *in personam* action. *Id.* at 810–11 (alteration in original) (quoting *Black's Law Dictionary* 1245 (6th ed. 1990)). However, we concluded in *State Engineer* that even though the action was styled as an *in personam* proceeding, that "formalistic distinction made not the least bit difference." *Id.* We looked "behind the form of the action to the gravamen of [the] complaint and the nature of the right sued on." *Id.* at 810 (internal quotation marks omitted). We concluded that there could be no serious dispute that Nevada had brought the contempt action to, in effect, force compliance with the decree over a *res*—the Humboldt River. *Id.* at 811. We therefore held that the action was *quasi in rem*, because the federal court could not hear the case without displacing the state court as the adjudicator of water rights in the Humboldt River. *Id.*; *see also Bank of N.Y.*, 296 U.S. at 478 (finding that an action was at least *quasi in rem* where it could not be adjudicated "without disturbing the control of the state court" over property).

## III.

The settlement approval proceedings in California Superior Court are, at minimum, *quasi in rem*. Goncalves settled with all of the medical malpractice defendants and the Superior Court approved the settlements. *See* Register of Actions, *supra*, at 121, 159. Consequently, the defendants paid out the settlement funds, triggering the Superior Court's duty to disburse the money appropriately.

The Superior Court has exercised significant control over the settlement funds, rendering the settlement approval proceedings at least *quasi in rem*.  At stake in those proceedings is not a personal judgment against any party; rather, the court is adjudicating various parties' rights to the settlement proceeds.  The court has ordered payment to Goncalves's attorneys for fees and expenses.  It has ordered the purchase of an annuity and that a portion of the funds be transferred into a special needs trust.  Further, it directed almost $500,000 into a client trust account pending resolution of nonparty lien claims.  Moreover, the court continues to exercise jurisdiction over the remaining funds in that account.  Goncalves's attorney cannot distribute the funds without the court's permission.

The majority makes much of the fact that the remaining settlement funds that could be distributed to the Blues are being held by Goncalves's attorney rather than by the Superior Court itself.  But the Supreme Court has explained that an action can be *quasi in rem* even when the property has not been "actually seized under judicial process."  *Bank of N.Y.*, 296 U.S. at 477.  Indeed, the Court has found proceedings to be *quasi in rem* where funds were being held by a trust company pending direction from the court.  *Id.* at 476–77.  Goncalves's attorney is holding almost $500,000 in a trust account waiting for the San Diego Superior Court's orders to disburse the funds and to whom.  Therefore, it is the Superior Court that effectively controls the funds.  The majority's argument is at odds with precedent as well as the functional analysis required by the prior exclusive jurisdiction doctrine.  Further, it is at odds with the Blues' litigation position—the Blues recognized in district court that the settlement funds constitute a "res that's currently in [the San Diego Superior Court's] possession."

Contrary to the majority's assertion, *see* Maj. Op. 33, the San Diego Superior Court exercised control over Goncalves's settlement funds *before* the Blues removed the lien-expungement motion to federal court.  The state court obtained jurisdiction over the settlement proceeds when it approved the initial three settlements on April 9, 2014 and began disbursing funds.  Register of Actions, *supra*, at 121. The Blues removed the lien-expungement action to federal court on July 28, 2014.  A portion of the funds from the initial settlements were deposited into the trust account held by Goncalves's attorney and continue to remain there, pending direction from the San Diego Superior Court.

## IV.

The lien-expungement motion removed by the Blues is *quasi in rem*.  The action arose during the San Diego Superior Court's administration of Goncalves's settlement funds.  The court was required by state law to determine which parties would be paid out of the settlement proceeds, and how much, and accordingly, to order payment.  *See* Cal. Prob. Code § 3601.  Before the court could order any payments to the Blues, however, Goncalves moved to expunge the Blues' lien.   In his motion, Goncalves invoked the court's jurisdiction under California Probate Code § 3601, which grants the court the duty to approve and order expenses. Motion for an Order Expunging Blue Cross/Blue Shield's Lien at 3–4, *Goncalves v. Rady Children's Hospital San Diego*, No. 37-2011-00085051-CU-MM-CTL (Cal. Super. Ct. filed 2011).  The Blues then removed the motion to federal court.

The jurisdictional basis of the removed motion is the San Diego Superior Court's power to control the settlement funds

and to order payment of expenses.  Goncalves explained in his motion that he filed it in San Diego Superior Court specifically because of that court's control over his settlement funds under California Probate Code § 3601.  Therefore, adjudicating the removed motion would necessarily require the federal court to control the settlement funds.  What Goncalves sought—and what the Blues oppose—is an order directing payment of the remaining settlement funds to Goncalves's trust instead of the Blues.

The majority appears to construe the removed action as one for declaratory relief.  It asserts that the Blues want only a declaration of their rights in the settlement funds.  But the Blues never even filed a declaratory relief action.  Rather, they removed a motion from state court concerning the disbursal of Goncalves's settlement funds.  Therefore, looking to "the gravamen" of the motion and the "nature of the right sued on," *State Eng'r*, 339 F.3d at 810, the motion is for lien enforcement and not for declaratory relief, contrary to the majority's characterization.  And actions for lien enforcement are *in rem*.  *See Cent. Bank v. Superior Court*, 30 Cal. App. 3d 913, 917 (1973) ("An action to foreclose a mechanics' lien . . . is an in rem action . . . .").  We cannot recharacterize the removed action simply because "[t]he Blues contend" in their briefing that all they want from the district court is "a rights determination."  *See* Maj. Op. at 33–34 n.5.

## V.

Goncalves's settlement funds form the basis of both the state and federal actions.  Therefore, both actions are at least *quasi in rem*.  Under the prior exclusive jurisdiction doctrine, only the court that first asserted jurisdiction over the property

may proceed.  The San Diego Superior Court was the first court to exercise jurisdiction over Goncalves's settlement funds.  Therefore, it should be the only court to proceed.

I respectfully dissent.